**TECHEM CHEMICAL CO., LTD., et al., Plaintiffs,**

**v.**

**M/T CHOYO MARU, her engines, apparel, tackle and furniture, In Rem, Defendant.**

**TAKEBAYASHI KISEN K.K., In Personam, Defendant and Third-Party Plaintiff,**

**v.**

**TEAM TANKERS A/S et al., Third-Party Defendants.**

Civ. No. T–74–1398.

United States District Court, D. Maryland.

June 25, 1976.

William R. Dorsey, III, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiffs.

John T. Ward, Richard R. Jackson, Jr., Ober, Grimes & Shriver, Baltimore, Md., for defendants.

THOMSEN, Senior District Judge.

Relying upon recent Supreme Court cases holding that certain state attachment and garnishment procedures violate the due process clause of the Fourteenth Amendment,[1] defendants herein, a Japanese vessel and her Japanese owner, contend that the customary admiralty procedures in rem and in personam with process of maritime attachment have been used and abused by plaintiffs in a way which has deprived defendant shipowner, without due process of law, of property rights protected by the Fifth Amendment.

The case arises out of a shipment of caustic soda from France to the United States on the M/T Choyo Maru. Part of the cargo was discharged in Bayonne, N.J., and the balance in Baltimore, Md. An action in rem against the vessel and in personam against her owner, Takebayashi Kisen K.K., with process of maritime attachment, was filed in this Court on December 20, 1974, by Techem Chemical Co., Ltd. (the shipper of the cargo and a consignee of part thereof) and Stanalchem, Inc. (an agent of Techem in New York). The complaint alleged that the cargo had been contaminated while in transit and claimed $4,000,000 in damages. The vessel was seized in Baltimore on December 21; it was released on December 30 at the request of counsel for the respective parties after the owner had agreed to provide security acceptable to plaintiffs' attorneys.[2] Thereafter, the shipowner filed an answer and two counterclaims: (1) for costs and expenses incurred

---

1. *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

2. The security originally posted consisted of a $500,000 letter of credit and a corporate and personal undertaking of $1,500,000 by the shipowner and its president. The $1,500,000 undertaking was released after about one month, when plaintiffs recognized that the total loss would be less than $500,000.

by the owner because the excessive security demanded by plaintiffs subjected the owner to unnecessary expenses, and (2) for indemnity based upon an alleged breach of warranty arising from a survey of the vessel which plaintiffs had a surveyor make before the cargo was loaded.

In December 1975, an amended complaint was filed, adding three plaintiffs, Westvaco Corp. and Domtar Fine Papers, Ltd. (the other two consignees) and Transatlantic Marine Claims Agency, Inc. (TMCA), the New York agent of the numerous unnamed cargo insurers, and reducing the amount claimed to $360,000, plus interest and costs. Defendants promptly answered the amended complaint and reasserted the shipowner's counterclaims: the first, now asserted against TMCA as well as Techem and Stanalchem, based on the alleged excessive demand for security, and the second, now asserted against all plaintiffs, based on the alleged breach of warranty.[3]

The case is now before the court on—

(1) Defendant owner's motion for the release of the remaining security posted by it, or if that relief is denied, that plaintiffs be required to post countersecurity in the amount of $435,000.[4] Defendants claim (a) that "the arrest and demand for security violated the constitutional right of defendant to due process of law", and (b) that the suit which resulted in the seizure of the vessel and the posting of the security for her release was instituted without authority from the original plaintiffs.

(2) Plaintiffs' motion for judgment on the pleadings with respect to defendant's counterclaims.

Depositions have been taken, documents have been offered in evidence, briefs have been filed and counsel have been heard on two occasions.

### Facts[5]

On December 3, 1974, the M/T Choyo Maru loaded a cargo of caustic soda solution (approximately 50% caustic soda by weight) in Lavera, France, following a survey of the vessel caused to be made by one or more of the plaintiffs. The vessel was then owned by defendant Takebayashi Kisen K.K., time chartered to third-party defendant Team Tankers A/S, and voyage chartered to third-party defendant Fluidiks B.V.; the voyage charter, in turn, was assigned by Fluidiks B.V. to third-party defendant Gulfstream Navigation Co. The cargo, shipped by plaintiff Techem Chemical Co., was consigned in part to the Royal Bank of Canada and in part to order; the parties agree in treating the concerns listed below as the consignees for the purposes of the pending motions:

| Consignee | Metric Tons | |
|---|---|---|
| | Liquid | Dry |
| Domtar Fine Paper (C.I.F. Bayonne) | 3150.000 | 1557.580 |
| Techem Chemical Co. | 2106.201 | 1034.144 |
| Westvaco Corp. (C.I.F. Baltimore) | 4200.000 | 2062.200 |
| | 9456.201 | 4653.924 |

The Domtar and Techem lots were discharged at Bayonne on December 18 and 19, 1974, and the Choyo Maru proceeded to Baltimore. On December 19 a surveyor at

---

**3.** Defendants also filed a third-party complaint against a time charterer, a voyage charterer and a sub-voyage charterer. The issues raised thereby are not involved in the pending motions.

**4.** In its answer to the amended complaint defendant owner included a demand that plaintiffs Techem, Stanalchem and TMCA be required to post security for defendant's counterclaims pursuant to Supplemental Admiralty Rule E(7), in the amount of $435,000 and that Domtar and Westvaco be required to post security in the amount of $360,000, or should plaintiffs fail to give such security, that the

suits brought by such plaintiffs be dismissed with prejudice and all security posted by defendant for the release of the vessel be vacated immediately.

**5.** The findings of fact are made for the purpose of ruling on the pending motions. If and when the case (including defendants' counterclaims and third-party claims) comes on for trial, these findings will not be considered conclusive; the facts should then be found for those purposes from all the evidence then before the court.

Bayonne advised Quinn, Director of Marketing for Stanalchem in New York, that there was contamination of the cargo. Quinn sent Cheng, another employee of Stanalchem, to "verify the problem", and also obtained the services of another surveyor to check the cargo in Bayonne.

The surveyors' initial examination indicated contamination, thought to have been caused by vegetable oil (the Choyo Maru's last previous cargo) or iron. Quinn contacted Techem and advised them of the cargo contamination, and received instructions from Techem to work with TMCA, the agent for the underwriters of the cargo insurance, on any potential claims. Quinn and others at Stanalchem contacted Heijmans, President of TMCA, on December 20, and advised him of the contamination. Also on December 20, Heijmans received a copy of a Telex message from Hudig and Company, of Rotterdam, Techem's insurance broker, which indicated that Hudig had been advised of the cargo damage and had instructed the consignee at Bayonne to contact TMCA. During several telephone conversations, Quinn and Heijmans reviewed the available options, including the possibility of filing suit against the ship and its owner, and discussed the potential damage to the cargo. Quinn thought that there was a "hundred percent loss," a "total loss" because he "didn't see any value in the material". Heijmans considered the cargo to be a "constructive total loss", a marine insurance term meaning, according to Heijmans, "that the cargo is rendered worthless for its intended purpose and the consignee cannot recondition it or return it to its original state". Quinn told Heijmans that the caustic soda was valued at "$400 per metric ton". Plaintiffs now concede that the $400 per ton figure was for dry caustic soda, not caustic soda in a liquid solution, as was the cargo involved in this suit. Therefore, since the cargo consisted of 9,456 tons of caustic soda solution, a little less than 50% caustic soda by weight, the total value of the cargo was $400 × 4,653 tons, less

than $2,000,000. However, on December 20, 1974, through some failure of communication, Heijmans, who had never dealt with caustic soda, multiplied the total cargo tonnage by the $400 per ton figure, and determined the value of the cargo to be $4,000,-000. Heijmans did not verify this figure with Quinn; indeed, the only gross valuation figure mentioned during their conversation was $2,000,000.[6] The weight of the evidence now before the court requires a finding that Heijmans' conclusion that the damage to the cargo was $4,000,000 was not justified.

During Heijmans conversations with Quinn, the possibility of instituting suit against the shipowner was discussed. Heijmans knew that Stanalchem was acting "in some capacity" for Techem, but he did not know what capacity, and he did not inquire. Quinn had received instructions from Techem to cooperate with TMCA, but Quinn had not received any instructions or permission to authorize TMCA to institute suit in Techem's name. Quinn testified that he did not authorize TMCA to institute suit in Techem's or Stanalchem's name, and that he did not have authority to do so. However, he did understand "that TMCA was going to take whatever steps were necessary to protect the interests of those who had interests in the cargo". Heijmans testified that Quinn instructed him not to contact Domtar and Westvaco because there was a possibility that those consignees were going to reject their portions of the cargo and attempt to stop their letters of credit. Heijmans also testified that during his conversations with Quinn he was not instructed to do anything, but that he was specifically authorized by Quinn to file suit in Stanalchem's name, and that these conversations "constituted authority for [Heijmans] to direct the institution of suit in the name of Techem". Heijmans also testified that on December 20 he discussed the possibility of filing suit with Van Reen of Hudig; that Van Reen did not instruct him to do anything, but left "the further handling of the

---

6. Both the dry ton estimate of approximately 5,000 tons and the liquid ton estimate of approximately 10,000 tons were mentioned in that conversation.

decision whether or not to file suit to [Heijmans'] discretion".

On December 20, Heijmans contacted various "P and I [protection and indemnity] representatives to find out with which club [group of insurers] the vessel was entered regarding P and I coverage. This [was] necessary for us in order to secure our interests by means of a letter of security which P and I agents may obtain for us, preventing the arrest of the vessel". Heijmans was advised by LaMorte, Burns, a P & I representative, that their initial research revealed no such coverage for the Choyo Maru.

Early in the afternoon of December 20, Heijmans contacted experienced admiralty counsel (Williams) in New York City about the cargo damage. During several telephone conversations and at least one personal conference, Heijmans told Williams that he had been contacted by Stanalchem, agents for Techem, and had been informed that the entire cargo of caustic soda on board the Choyo Maru was contaminated due to faulty tanks, and that the entire cargo was being rejected by the consignees because of the contamination. Heijmans also told Williams that approximately 5,000 tons, a little more than half of the entire cargo, had been discharged at Bayonne, that the remainder was to be discharged at Baltimore, and that that cargo was worth $400 per ton, with resulting losses of $2,000,000 for the Bayonne portion and $4,000,000 for the entire cargo.

Williams did not attempt to verify the amount of damages involved with anyone at Techem or Stanalchem, but relied entirely on the information supplied by Heijmans. Williams had never personally handled a suit for Techem or Stanalchem but he had had prior dealings with Heijmans.

Heijmans initially instructed Williams to file suit, and, after learning of the probable lack of P & I coverage, he instructed Williams to arrest the vessel. Heijmans testified that he told Williams that the "parties in interest" to the suit were Techem and Stanalchem, and that he "had the authority from Stanalchem to commence suit". Heij-

mans' testimony concerning the authority to institute suit in Techem's name is contradictory: he testified first that he did not tell Williams that he was authorized to instruct him to file suit in the name of Techem; later he testified that he understood that he had authority from Stanalchem to institute suit in Stanalchem's name and in Techem's name and that he conveyed this understanding to Williams. Williams testified that Heijmans informed him that he had authority to institute suit and to arrest the Choyo Maru for "the principals involved", that "the authority came through the President of Stanalchem, Mr. Hans Gold, and Mr. Richard Quinn", and that "their authority was sufficient for initiation of the suit on behalf of Techem". Williams also testified that, as of December 20, "the underwriters were not subrogated and we wanted authority to bring suit and we had that authority through Mr. Heijmans". Williams stated that it is common practice to institute suit when underwriters indicate that they have authority and request that a suit be instituted, if "we know the underwriter and where he's from".

Having been instructed by Heijmans to file suit and to arrest the vessel, Williams contacted Owen, an experienced admiralty lawyer in Baltimore. Williams told Owen that he had been instructed by a representative of underwriters to represent them in an urgent matter involving a complaint against a vessel for cargo damage; that the vessel would be arriving in Baltimore that day, December 20, and would be going off charter in Baltimore; that the cargo of caustic soda was worth $4,000,000; that 6,000 tons which had been discharged in New York had been found to be contaminated by vegetable oil and had been rejected by the New York consignee, Domtar; that the remaining 4,000 tons were to be discharged in Baltimore, and while he did not know definitely, he had to assume that the Baltimore cargo would show the same type of contamination that the New York cargo did, and that it probably would be rejected by the Baltimore consignee, Westvaco. Owen asked Williams how much he should claim in the complaint, and Williams

said "$4,000,000, the value of the cargo, with part of it already rejected and a reasonable assumption that the rest of it would be rejected." Based on this information, Owen drafted a complaint which was filed the same day, December 20. That complaint was filed in the name of Techem and Stanalchem, "owners of the cargo", as an admiralty or maritime claim within the meaning of Rule 9(h), F.R.Civ.P., in rem against the Choyo Maru and in personam against Takebayashi Kisen K.K. with process of maritime attachment.[7] See Rules A, B, C and E of the Supplemental Rules for Certain Admiralty and Maritime Claims.

Upon the filing of the complaint, the clerk of this court issued:

(1) a "Warrant for Arrest in Action in Rem" (see Supp. Rule C(3)), addressed to the Marshal for this District, directing him to seize the vessel and to detain her in his custody until the further order of the Court, and to give the notice required by Supp. Rule C(4), and

(2) a "Process of Maritime Attachment and Garnishment" against defendant Takebayashi (see Supp. Rule B(1)), directing the Marshal "that if the said Defendant cannot be found within the District you attach goods and chattels to the amount sued for; and if such property cannot be found that you attach goods and chattels or credits and effects to the amount sued for in the hands of the Master and/or Officer in charge of and/or in the possession of the M/T CHOYO MARU Garnishee * * *".

On December 21, 1974, the Marshal served the warrant and the process on the Captain of the Choyo Maru in Baltimore harbor.[8]

The owner of the vessel promptly retained local counsel and the president of the owner came from Japan to New York to negotiate the release of the vessel.

On December 30 an untitled paper, signed by attorneys for plaintiffs and attorneys for defendants, was filed herein. It recited that the claimant (defendant owner) was making arrangements to provide security and requested and authorized the clerk to release the vessel forthwith from arrest and attachment, with the understanding that by

---

7. The complaint alleged that Techem and Stanalchem were the owners of 10,000 tons of caustic soda which they had caused to be delivered to defendant Takebayashi in Lavera, France, in good order and condition, for shipment on board the Choyo Maru to New York and Baltimore pursuant to certain charter parties and/or ocean bills of lading, and for delivery to designated consignees; that the caustic soda was discharged and delivered contaminated and otherwise damaged, as a result of which plaintiffs "suffered damages presently estimated at $4,000,000"; that said damages resulted from (a) breach by defendants of their agreement and warranties to provide a seaworthy vessel and to safely load, carry and deliver the caustic soda in like good order and condition as when received for shipment, and (b) negligence of defendants.

Plaintiffs demanded: (a) the arrest of the Choyo Maru, with notice to all persons claiming any interest therein to appear and answer; (b) that process of maritime attachment and garnishment be issued against defendant Takebayashi, and that the Choyo Maru be attached pursuant thereto; (c) that the Choyo Maru be condemned and sold and proceeds applied to pay to plaintiffs the sum of $4,000,000 plus interest and costs; (d) that judgment be entered against defendant Takebayashi in the

sum of $4,000,000 plus interest and costs; and (e) other and further relief.

The complaint was verified by Owen's affidavit that the contents of the complaint were "true to the best of his knowledge, information, and belief, based upon information furnished to him by Plaintiff", that "to the best of his knowledge, information, and belief, Defendant Takebayashi cannot be found within the District of Maryland", and that he made the affidavit because plaintiff has no office, place of business or representative within the District. It is customary and practically necessary for the local attorney to make the so-called "proctor's affidavit" in many cases; the problem in this case is that the information furnished to the Baltimore attorney by the New York attorney, who in turn had received it from an insurance claim agent and not from either of the original plaintiffs, was wrong in several respects.

8. Pursuant to Local Rule 47 of this court, the attorneys for plaintiffs tendered to the Marshal an advance deposit of $2,000 required by the Department of Justice "to secure the cost for safe custody and preservation of the vessel, for dockage, keepers, maintenance and insurance". No other deposit or bond is required by any rule and none was furnished.

releasing the vessel plaintiffs did not waive their maritime lien on the vessel or any other rights against the vessel or against Takebayashi. After further negotiations, Takebayashi, on about January 7, 1975, provided a $500,000 letter of credit in favor of TMCA, the claims agent for various marine insurance underwriters, and a $1,500,000 personal and corporate letter of guarantee executed by the vessel owner and by its president. By that time plaintiffs' attorneys had learned that the value of the cargo was $2,000,000 and not $4,000,000, as alleged in the complaint. Neither Techem nor Stanalchem participated in the security negotiations, which were conducted by Heijmans, of TMCA, who had received authority to do so from Stanalchem and Hudig, the Dutch insurance broker. Within a month thereafter, as a result of negotiations between TMCA, as agent for the cargo insurers and consignees, Heijmans learned that the total amount of damages was less than $500,000. Accordingly, on or about February 7, 1975, plaintiffs released the $1,500,000 personal and corporate letter of guarantee, but retained the $500,000 letter of credit.

After some discovery, defendant filed an answer, including several affirmative defenses,[9] and two counterclaims.[10] Plaintiffs

answered the counterclaims, denying liability.

It was not until May 21, 1975, that Techem sent Williams' firm authority to "begin, prosecute and carry to completion" the action and legal proceeding "which it has" against the owners of the Choyo Maru "arising out of the shipment and contamination on board said vessel of approximately 9400 tons of caustic solution". A generally similar authority was received from Stanalchem on June 25, 1975.[11]

On December 5, 1975, plaintiffs asked and were granted leave to file an amended complaint, wherein they: added three new plaintiffs, TMCA, Domtar and Westvaco;[12] alleged that Domtar and Westvaco, along with plaintiff Techem, "were or became" the owners of the 10,000 tons of caustic soda in question; and alleged that plaintiff Stanalchem (originally alleged to have been an owner but now admitted not to have been an owner or purchaser of the cargo) had assisted Techem in the handling and clearing of the documents pertaining to the shipments sold by Techem and in the storage of the Techem portion of the cargo upon arrival; realleged that the cargo was damaged while in the custody of defendants; and reduced plaintiffs' total claim for damages from $4,000,000 to $360,000, plus

9. One of the affirmative defenses alleged that plaintiffs had conducted a survey of the Choyo Maru's tanks in Lavera and approved the loading of the cargo involved.

10. One of the counterclaims alleged that plaintiffs, as active participants in the trading of industrial chemicals, including caustic soda solution, knew or should have known that even if the caustic soda solution carried aboard the Choyo Maru was contaminated by iron to the degree alleged, such contamination by itself would have little or no effect on the fair market value of the cargo, and that, notwithstanding such knowledge, plaintiffs caused the Choyo Maru to be arrested to satisfy a claim alleged, under sworn affidavit, to be $4,000,000; that such actions damaged defendants in various ways, including the expenses of sending representatives from Japan to New York, the loss of use of the vessel for some days, the cost of furnishing of the letter of credit, and the furnishing of the letter of understanding, which temporarily affected its credit. The second

counterclaim was based on an alleged warranty by plaintiffs resulting from the survey of the vessel plaintiffs had caused to be made before the cargo was loaded.

11. At some unspecified prior date, another attorney had contacted defendants' attorneys, stating that he represented Techem and Stanalchem.

12. Transatlantic Marine Claims Agency (TMCA) was added as a plaintiff "because of payments made" to Techem, Domtar and Westvaco under certain insurance policies. The names of the insurers do not appear in any of the pleadings. At a deposition taken in April 1976 the settlement papers were introduced into evidence; they showed that Domtar and Westvaco had assigned their claims to TMCA as part of their settlement with the insurers for whom TMCA is an agent. The claim of Techem was not settled and assigned until sometime in 1976.

interest and costs. The lower figure was the total of the settlements made with Techem, Domtar and Westvaco by Transatlantic as agent for the cargo insurers. The customary affidavit to the amended complaint was made by one of the New York attorneys for plaintiffs, "based upon information furnished to him by plaintiffs".

Takebayashi answered the amended complaint on December 18, 1975, reasserting its affirmative defenses, reasserting its two counterclaims (see n. 9, above) with greater detail, and demanding countersecurity or, upon failure of plaintiffs to give such security, that plaintiffs' suits be dismissed with prejudice and all security provided by defendants for the release of the Choyo Maru be vacated immediately.

On January 23, 1976, defendant Takebayashi moved for an order compelling plaintiffs to answer its counterclaims and for an order releasing the remaining security (the $500,000 letter of credit) Takebayashi had posted in January 1975, unless plaintiffs provided the countersecurity Takebayashi had demanded in its answer to the amended complaint. At a hearing in March 1976 the court was advised that the letter of credit had been reduced to $400,000.

On February 3, 1976, the appropriate plaintiffs moved (a) for a judgment on the pleadings with respect to defendant Takebayashi's counterclaims or (b) that Takebayashi's demands for countersecurity be stricken. The next day they answered Takebayashi's motion for an order releasing the remaining security. Defendants have answered plaintiffs' recent motions. Depositions have been taken, briefs have been filed and considered and oral argument has been heard.

13. In *The Western Maid*, 257 U.S. 419, 432, 42 S.Ct. 159, 161, 66 L.Ed. 299 (1922), Justice Holmes, speaking for the Court said:

"[W]e must realize that however ancient may be the traditions of maritime law, however diverse the sources from which it has been drawn, it derives its whole and only power in this country from its having been accepted and adopted by the United States.

*Constitutionality*

The first ground for defendant owner's motion for release of the remaining security posted by it is that the arrest of the vessel and the demand for security violated defendant's right to due process under the Fifth Amendment.

Proceedings in rem against a vessel and proceedings in personam with process of maritime attachment have long been recognized as part of the maritime law administered by the district courts of the United States pursuant to (1) Article III, section 2 of the Constitution, (2) a series of statutes, running back to the late 1700's, including the Act of June 25, 1948, ch. 646, 62 Stat. 931, 28 U.S.C. § 1333, and (3) rules adopted by the Supreme Court of the United States from time to time pursuant to various statutes, the latest of which is P.L. 89–773, § 1, Nov. 6, 1966, 80 Stat. 1323, 28 U.S.C. 2072.[13] The applicable rules are Rule 9(h), F.R. Civ.P., and Rules A, B, C and E of the Supplemental Rules for Certain Admiralty and Maritime Claims.

█ Both the in rem and the maritime attachment procedures set out in those rules permit the seizure of a vessel pursuant to a warrant for her arrest or attachment issued by the clerk of the district court without giving the owner prior notice or an opportunity to be heard. No pre-seizure hearing or review of the papers by the judge or any other federal magistrate is contemplated; upon the filing of the complaint the clerk is required by Rule B(1) or Rule C(3), forthwith to issue a summons and process of attachment or a warrant for the arrest of the vessel, or both, as in this case. No bond to protect the owner of the vessel if the plaintiffs fail to prevail is required.

There is no mystic over-law * * *. When a case is said to be governed by * * general maritime law that is only a short way of saying that for this purpose the sovereign power takes up a rule suggested from without and makes it part of its own rules." See also *The Lottawanna*, 88 U.S. (21 Wall.) 558, 22 L.Ed. 654 (1875).

In practice, the owner almost always receives prompt notice of the seizure and employs an attorney who arranges for the release of the vessel upon the posting of a bond, letter of credit or other undertaking.[14] If the parties are unable to agree with respect to the nature or amount of the security, a hearing before a district judge is provided for by Rule E(5).

Before the recent cases, cited in n. 1, supra, in which the Supreme Court held that certain state attachment and garnishment proceedings violate the due process clause of the Fourteenth Amendment, the Court had repeatedly sanctioned proceedings in rem and in personam with process of maritime attachment, in face of various attacks on grounds other than those urged by defendant in this case. See, e. g., *Swift & Co. v. Compania Caribe,* 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). Indeed, as we have seen, the Court provided for such proceedings in rules governing maritime cases adopted by the Court from time to time. However, as Justice Brandeis stated in *Washington Southern Co. v. Baltimore Co.,* 263 U.S. 629, 44 S.Ct. 220, 68 L.Ed. 480 (1924), discussing the construction of the admiralty rule then in effect providing for countersecurity:

> "The function of rules is to regulate the practice of the court and to facilitate the transaction of its business. * * * Most rules are merely a formulation of the previous practice of the courts. Occasionally, a rule is employed to express, in convenient form, as applicable to certain classes of cases, a principle of substantive law which has been established by statute or decisions. But no rule of court can enlarge or restrict jurisdiction. Nor can a rule abrogate or modify the substantive law." 263 U.S. at 635, 44 S.Ct. at 222.

■ Due process is inherently a flexible concept; what process is due in any situation is determined by an analysis of the particular circumstances, including the functions served and interests affected. In the recent cases the Court emphasized that the fundamental requirements of due process are notice and a right to be heard, and both "must be granted at a meaningful time and in a meaningful manner". *Fuentes v. Shevin,* 407 U.S. 67, at 80, 92 S.Ct. 1983, at 1994, 32 L.Ed.2d 556 (1972), quoting from *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). See also *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Both notice and a hearing are ordinarily required *before* property is taken, although, as the Court stated in *Fuentes* :

> "There are 'extraordinary situations' that justify postponing notice and opportunity for a hearing. *Boddie v. Connecticut,* 401 U.S. [371] at 379 [91 S.Ct. 780 at 786, 28 L.Ed.2d 113]. These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. * * * " 407 U.S. at 90-91, 92 S.Ct. at 1999.

The Court noted that the first prong of the test may be met in a situation where *summary seizure is necessary to secure jurisdiction in the court*—"clearly a most basic and important public interest". *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), cited in *Fuentes,* 407 U.S. at 91, n. 23, 92 S.Ct. 1983, 1999. The in rem and quasi in rem procedures provided for in the Supplemental Rules satisfy this prong of the test; in view of the transient nature of the maritime world, summary action is necessary to gain jurisdiction over the offend-

14. See Advisory Committee Note to Rule B.

ing vessel itself[15] or to gain jurisdiction over a defendant owner by seizing his property found in the district.[16]

The second prong's requirement of a need for very prompt action is obviously met, since the vessel, the subject of the suit in rem and the property subject to attachment in the in personam action, could sail away at any time. In admiralty, some things are "reasonable because they are necessary". *The Mary,* 13 U.S. (9 Cranch) 126, 3 L.Ed. 678 (1815).

The third prong presents greater difficulty. The Court in *Fuentes* noted that under the replevin statutes involved in that case "[n]o state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark." 407 U.S. at 93, 92 S.Ct. at 2001.

In *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the Court upheld a Louisiana sequestration statute which permitted the seller-creditor holding a vendor's lien to secure a writ of sequestration and, having filed a bond, to cause the sheriff to take possession of the property at issue. The writ, however, was issuable only by a judge upon the filing of an affidavit going beyond mere conclusory allegations and clearly setting out the facts entitling the creditor to sequestration. The Louisiana law also expressly entitled the debtor to an immediate hearing after seizure and to dissolution of the writ absent proof by the creditor of the grounds on which the writ was issued.

In *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), the Court struck down a Georgia garnishment statute, under which a sizable commercial bank account was garnished. The Court noted that the "bank account * * * was impounded and, absent a bond, put totally beyond use during the pendency of the litigation on the alleged debt, all by a writ of garnishment issued by a court clerk without notice or opportunity for an early hearing and without participation by a judicial officer." 419 U.S. at 606, 95 S.Ct. at 722. Noting that the Georgia statute had none of the "saving characteristics" of the Louisiana statute in *Mitchell,* the Court listed the Georgia statute's faults: (1) the writ of garnishment is issuable on the affidavit of the creditor or his attorney, and the latter need not have personal knowledge of the facts; (2) the affidavit need contain only conclusory allegations; (3) upon service of the writ, the debtor is deprived of the use of the property, and the only method discernible on the face of the statute to dissolve the garnishment was to file a bond to protect the plaintiff creditor; and (4) there is no provision for an early hearing at which time the creditor would be required to demonstrate at least probable cause for garnishment. Justice Powell, concurring in the judgment, noted that "the Court in the past unanimously approved prejudgment attachment liens similar to those at issue" in Georgia, "[b]ut the recent expansion of concepts of procedural due process requires a more careful assessment of the nature of the governmental function served by the challenged procedure and of the costs the procedure exacts of private interests". 419 U.S. at 610, 95 S.Ct. at 724.

The recent Supreme Court cases indicate that there is a serious question whether the provisions in the Supplemental Rules for proceedings in rem and proceedings in personam with process of maritime attachment

**15.** "[P]ersonification of the vessel, treating it as a juristic person whose acts and omissions * * * are personal acts of the ship for which, as a juristic person, she is legally responsible, has long been recognized by this Court." *Canadian Aviator Ltd. v. United States,* 324 U.S. 215, 224, 65 S.Ct. 639, 644, 89 L.Ed. 901 (1945).

**16.** "The process of foreign attachment is known of old in admiralty. It has two purposes: to secure a respondent's appearance and to assure satisfaction in case the suit is successful." *Swift & Co.,* 339 U.S. at 693, 70 S.Ct. at 867.

provide due process to owners of the vessels seized.[17] This court intimates no opinion whether the problem can be solved by a local rule, local custom or practice of the judges providing a review of the complaint and affidavit by a judge or other federal magistrate before the clerk issues a warrant for arrest of the vessel or process for its attachment.[18]

It is not necessary, however, to decide the constitutional question in this case; the defects in the original complaint, discussed below, entitle the defendant shipowner herein to equitable relief substantially as satisfactory as the relief to which it would be entitled if the process were declared to be unconstitutional.

### Equitable Relief

As noted in footnote 4, defendant shipowner's motion asks this court for an order releasing the remaining security posted by it, or if that relief is denied, that plaintiffs be required to post countersecurity.

Supplemental Rules E(6) and (7) provide in pertinent part: E(6)—"Whenever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given; * * *." E(7) —"Whenever there is asserted a counterclaim arising out of the same transaction or occurrence with respect to which the action was originally filed, and the defendant or claimant in the original action has given security to respond in damages, any plaintiff for whose benefit such security has been given shall give security in the usual amount and form to respond in damages to the claims set forth in such counterclaim, unless the court, for cause shown, shall otherwise direct; and proceedings on the original claim shall be stayed until such security is given, unless the court otherwise directs. * * *"

Rule E(6) does not explicitly authorize the releasing of *all* security posted. Rule E(7) explicitly authorizes the court to require plaintiffs to post security on defendants' counterclaim based on the alleged breach of warranty arising out of the inspection of the vessel which the present plaintiffs or one or more of them caused to be made in France before the vessel was loaded. Rule E(7) does not itself authorize the court to require plaintiffs to post security on defendants' first counterclaim (based on grossly excessive and improper demand for security). An admiralty court, however, may in an appropriate case grant equitable relief which is not limited by the provisions of Rules E(6) and E(7).

In *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), the Court said: "Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief. See *Swift & Co. v. Compania Caribe,* 339 U.S. 684, 691–692, [70 S.Ct. 861, 94 L.Ed. 1206] where we said, 'We find no restriction upon admiralty by chancery so unrelenting as to bar the grant of any equitable relief even when that relief is subsidiary to issues wholly within admiralty jurisdiction.'" 369 U.S. at 530, 82 S.Ct. at 999. See also *Greenwich Marine, Inc. v. S. S. Alexandra,* 339 F.2d 901, 905 (2 Cir. 1965).

The Advisory Committee Note to Supplemental Rule A echoes statements in these and other admiralty decisions. That Note states in pertinent part that "these Rules are not to be construed as limiting or impairing the traditional power of a district court, exercising the admiralty and maritime jurisdiction, to adapt its procedures and its remedies in the individual case, consistently with these rules, to secure the just, speedy, and inexpensive determination of every action. (See *Swift & Co. Packers v. Compania Columbiana Del Caribe, S/A,* 339

---

**17.** For a general discussion of some of the problems presented by this case, see Morse, *The Conflict Between the Supreme Court Admiralty Rules and Sniadach-Fuentes: a Collision Course?,* 3 Fla.St.U.L.Rev. 1 (1975); McCreary, *Going for the Jugular Vein: Arrests*

*and Attachments in Admiralty,* 28 Ohio St.L.J. 19 (1967).

**18.** See Advisory Committee Notes to Supplemental Rules A and C.

U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950); Rule 1). * * * "

■ The facts of record in this case justify equitable relief to defendant shipowner at this time. The original complaint alleged that the plaintiffs therein, Techem and Stanalchem, were the owners of the 10,000 tons of caustic soda shipped aboard the Choyo Maru, and that they had "suffered damages presently estimated at $4,000,000" by reason of the breach by defendants of their agreement and warranties and negligence of defendants. In fact Stanalchem was not an owner of any part of the cargo.[19] The amount claimed was unjustified by the facts available to those undertaking to speak for the plaintiffs, and is now shown to have been more than ten times the actual loss.

■ The question whether either of the original plaintiffs authorized TMCA to cause this action to be instituted is far from clear on the evidence now before this court; the weight of the present evidence is that they did not, and the court so finds for the purposes of these motions. It does appear, however, that Techem and Stanalchem have ratified the filing of the original complaint.[20] This court concludes that such ratification is sufficient to permit the prosecution of this case, but makes Techem and Stanalchem responsible for what was done in their names before the ratification. In *The North Carolina,* 40 U.S. (15 Peters) 39, 48, 10 L.Ed. 653 (1841), the Court, speaking through Chief Justice Taney, stated: " * * we consider it as well settled, in admiralty proceedings, that the agent of absent owners may libel, either in his own name, as agent, or in the name of his principals, as he thinks best; that the power of attorney, subsequent to the libel, is a sufficient ratification of what he had before done in their behalf; * * * ". That decision was cited and followed in *Aunt Jemima Mills Co. v. Lloyd Royal Barge,* 34 F.2d 120, 122 (2 Cir. 1928, L. Hand, Swan and A. N. Hand), where the court said: "Undoubtedly an agent's unauthorized act in filing a libel for absent owners may be subsequently ratified by them, and proof of such ratification, made before the decree is entered, will be sufficient." Rule 17(a), F.R.Civ.P. provides in pertinent part: "No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." Professor Moore states that this provision, which was added by the 1966 amendments, was a contribution of the admiralty practice, and was later extended to civil actions as well. 7A Moore's Federal Practice (1972), ¶ 55[3], p. 402; Ibid., vol. 3A (1974), ¶ 17.15–1, p. 601. Cf. *Meredith v. The Ionian Trader,* 279 F.2d 471 (2 Cir. 1960); *In re Retail Chemists Corporation,* 66 F.2d 605 (2 Cir. 1933). And see *The Nichiyo Maru,* 89 F.2d 539 (4 Cir. 1937).

The seizure of the vessel has subjected defendant shipowner to substantial loss and expense, including that resulting from the detention of the vessel in Baltimore for about a week, the expense of one or more

19. The amended complaint alleges that "Techem, Domtar and Westvaco were or became the owners of [the cargo]".

20. In May 1975, Techem authorized Williams' firm to "begin, prosecute and carry to completion all that action or legal proceeding which it has against the owner and/or disponent owners of the motor tanker 'Choyo Maru' arising out of the shipment and contamination on board the said vessel of approximately 9,400 tons of caustic soda solution". In June 1975 Stanalchem authorized the same firm to "bring suit in its name and to begin to prosecute and defend in its behalf a claim against the owners of the M.T. 'CHOYO MARU' arising out of a shipment carried on board the said vessel on or about December 1974 * * * ". The amended complaint was filed on December 5, 1975. In June 1976 Techem and Stanalchem, acting through an "Attorney-in-Fact" confirmed and ratified the filing of the complaint, the issuance of the writ of attachment against the M/T Choyo Maru, the arrest of the vessel, and the conclusion of an agreement to release the vessel against the posting of security.

persons coming from Japan to New York to negotiate the release of the vessel, and the continuing costs (10% per annum) of maintaining the letter of credit (originally for $500,000 now reduced to $400,000). It is likely that this case will not be concluded in the near future; depositions will probably have to be taken in several foreign countries, and future expenses will be substantial. Plaintiffs argue that defendant shipowner could have applied to the court to fix the amount of the security under Supplemental Rule E(5)(a), but elected not to do so, and agreed to the amount of security to be posted. That is true, but defendant shipowner was acting under duress—the seizure of its vessel pursuant to the unjustified allegations—and plaintiffs' conclusion that defendant cannot now be heard to complain or assert any cause of action based on the security it posted ignores the equities of the situation in favor of defendant shipowner created by the unjustified allegations.

After considering all of the evidence and arguments presented to the court by trial counsel for both sides, who have been eminently fair in their respective presentations, the court has concluded that the appropriate equitable relief is that the remaining security posted by defendant shipowner (the letter of credit, now in the amount of $400,000) should be released within 30 days from the date of this opinion and order, unless plaintiffs Techem, Stanalchem and TMCA post security in the amount of $400,000 for any judgment, including costs and expenses, which may be rendered in favor of defendant on its counterclaims against them or any one or more of them. Unless those plaintiffs post such security within 30 days from the date of this opinion and order, the security now posted by defendant shipowner will be released and the case will proceed as an action in personam on the amended complaint and defendant owner's counterclaims and third-party claims.

It is so ordered.

Plaintiff's motion for judgment on the pleadings in their favor on defendants' counterclaims is hereby denied without prejudice to the points raised in those motions being considered at some appropriate time in the future after the facts have been more fully developed.