**GRAND BAHAMA PETROLEUM CO., LTD., Plaintiff,**

**v.**

**CANADIAN TRANSPORTATION AGENCIES, LTD., Seatrans Co., Ltd., and Odd Munsen, a/k/a–d/b/a Seatrans, CTA/Seatrans, Pacific Seatrans Co., PAC Seatrans Co., Defendants,**

**and**

**Seattle-First National Bank, Garnishee.**

**No. C77–573B.**

United States District Court, W. D. Washington, Seattle.

April 6, 1978.

448

Robert H. Madden and Robert W. Nolting of Howard, Le Gros, Buchanan & Paul, Seattle, Wash., for plaintiff.

Douglas S. Dunham of Skeel, McKelvy, Henke, Evenson & Betts, Seattle, Wash., for defendants.

George F. Chandler, III of Bigham, Englar, Jones & Houston, New York City, for American Institute of Marine Underwriters, amicus curiae.

David R. Owen of Semmes, Bowen & Semmes, Baltimore, Md., Graydon S. Staring of Lillick, McHose & Charles, San Fran-

cisco, Cal., for The Maritime Law Ass'n of the United States, amicus curiae.

## OPINION

BEEKS, District Judge.

In this action plaintiff Grand Bahama Petroleum Company (Grand Bahama), a Bahamian corporation, seeks to recover the value of fuel oil and other incidental services supplied to the Soviet flag vessel M/V KUIBSHEVGES, while allegedly under charter to defendants, citizens of Canada. (Defendant Munsen may also be a citizen of Norway). Jurisdiction is based upon Supplemental Rule B(1) of the Federal Rules of Civil Procedure[1] and the garnishment of a bank account in the amount of $8,851.38 on deposit with garnishee defendant in the name of Pacific Seatrans, but allegedly the property of all defendants. Defendants seek dismissal alleging lack of jurisdiction upon the ground that both the remedy and procedure prescribed in Rule B(1) violate the due process clause of the fifth amendment of the U.S. Constitution. They contend that the recent case of *Shaffer v. Heitner*[2] indicates that jurisdiction based on attachment is no longer permissible without the presence of minimum contacts. They further contend that the procedure used to seize their bank account was improper since it provided them no protection against mistaken deprivation of property as required by the *Sniadach v. Friendly Finance Corp.*[3] line of cases.[4]

Plaintiff maintains a fueling facility in Freeport, Grand Bahama Island. In early July, 1977, KUIBSHEVGES, allegedly owned by Murmansk Shipping Company (not involved herein) and under charter to defendants, called at Grand Bahama's facility to take on bunkers. Plaintiff avers that it agreed to provide approximately 330 metric tons at a specified price plus barge fees (presumably hire) upon the promise of defendants to contemporaneously deposit $45,000.00 with plaintiff, any excess to be refunded. Grand Bahama supplied the vessel with 2,296 barrels of fuel on or about July 6 and charged defendants $40,363.68 plus barge fees of $600.00 therefor. Defendants apparently failed to make the required deposit and have not paid the amount due, or any part thereof.

Grand Bahama filed suit in this district August 3, 1977 to recover this debt from defendants. Since none of the defendants could be found within this district, Grand Bahama sought to attach any of their property which could be so found pursuant to Rule B(1). Remedies provided by state law are not involved. Plaintiff filed an amended complaint on August 9, 1977 and defendants filed an appearance on September 6. On November 28, 1977 defendants filed a motion to dismiss the action for lack of jurisdiction.

Before proceeding to the merits of the motion, it is necessary to consider a contention advanced that a federal district court lacks the power to declare a rule of the

1. Federal Rules of Civil Procedure, Supplemental Rule B(1):

 With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees named in the complaint to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or his attorney that, to the affiant's knowledge, or to the best of his information and belief, the defendant cannot be found within the district. When a verified complaint is supported by such an affidavit the clerk shall forthwith issue a summons and process of attachment and garnishment. In addition, or

 in the alternative, the plaintiff may, pursuant to Rule 4(e), invoke the remedies provided by state law for attachment and garnishment or similar seizure of the defendant's property. Except for Rule E(8) these Supplemental Rules do not apply to state remedies so invoked.

2. 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

3. 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

4. There is no contention that the principles enunciated in these fourteenth amendment cases may not be imputed to the due process clause of the fifth amendment.

Supreme Court unconstitutional.[5] It is argued that should a district court strike a rule, it is tantamount to ordering the Supreme Court to rewrite it, which is, of course, improper since Congress specifically conferred that power upon the Supreme Court pursuant to 28 U.S.C. § 2072.[6] It is also noted that no rule of court can enlarge or restrict jurisdiction,[7] nor can a rule abrogate or modify the substantive law.[8] It is apparently inferred that a rule promulgated by the Supreme Court, by definition, cannot violate the Constitution.

I do not agree. The Supreme Court does not promulgate rules in the same manner it decides questions of law. When engaged in rule-making, the Court acts only in an administrative and not a judicial capacity. The federal rules of procedure "are the work of very capable advisory committees. Those committees, not the Court, wrote the rules."[9] While the Court certainly considers the constitutionality of a rule recommended by a committee, it is not possible for its members to anticipate every constitutional objection. The Court itself has recognized this. "The fact that this Court promulgated the rules as formulated and recommended by the Advisory Committee does not foreclose consideration of their validity, meaning or consistency."[10]

While institutional propriety must be considered whenever a district court undertakes an examination of the federal rules, such considerations may not take precedence over this court's constitutional obligations. Issues of constitutional dimension must be determined by the courts. "Where rights secured by the Constitution are involved, there can be no rule-making or legislation which would abrogate them."[11]

It has long been the law that the rule-making power delegated by Congress to the Supreme Court is limited in scope to those which Congress could have rightfully exercised.[12] If Congress had promulgated Rule B(1), there is no question that this court could consider a properly presented constitutional challenge to it. This fact is not altered simply because the Supreme Court promulgated Rule B(1) under powers delegated by Congress. "[A] constitutional prohibition cannot be transgressed indirectly . . . any more than it can be violated by direct enactment."[13]

Furthermore, the fact that Rule B(1) may be a rule of substance rather than procedure is immaterial. I am "aware of no principle which protects a longstanding axiom of law from being invalidated when it is antiquated and offends some portion of the Constitution as currently interpreted by the Supreme Court."[14]

Finally, it is argued that federal rules should not be changed by case law. Rather, changes should be left to the Supreme Court pursuant to its rule-making powers. This contention is without merit. The question at issue is not merely whether

5. *Harris v. Zion's Savings Bank,* 127 F.2d 1012 (10th Cir. 1942), *aff'd,* 317 U.S. 447, 63 S.Ct. 354, 87 L.Ed. 390 (1943).

6. *Bethlehem Steel Corp. v. S/T VALIANT KING,* 1977 A.M.C. 1719, 1726 (E.D.Pa.1974).

7. *Washington-Southern Nav. Co. v. Baltimore & Philadelphia Steamboat Co.,* 263 U.S. 629, 635, 44 S.Ct. 220, 68 L.Ed. 480 (1924).

8. 28 U.S.C. § 2072.

9. Order of the Supreme Court of Feb. 28, 1966 promulgating Federal Rules of Civil Procedure, Dissenting Statement of Mr. Justice Black.

10. *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444, 66 S.Ct. 242, 246, 90 L.Ed. 185 (1946).

11. *Miranda v. Arizona,* 384 U.S. 436, 491, 86 S.Ct. 1602, 1636, 16 L.Ed.2d 694 (1966).

12. *See F.C.C. v. Schreiber,* 381 U.S. 279, 290–91, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); *Wayman v. Southhard,* 23 U.S. (10 Wheat.) 1, 42–43, 6 L.Ed. 253 (1825).

13. *Bailey v. Alabama,* 219 U.S. 219, 239, 31 S.Ct. 145, 151, 55 L.Ed. 191 (1911); *accord, Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460, *reh. denied,* 358 U.S. 860, 79 S.Ct. 12, 3 L.Ed.2d 95 (1958).

14. *Karczewski v. Baltimore and Ohio R. R. Co.,* 274 F.Supp. 169, 175 (N.D.Ill.1967); see *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

Rule B(1) should be amended, but whether it is constitutionally valid.

Since I may properly consider a constitutional challenge to a rule promulgated by the Supreme Court, it is now appropriate to consider the merits of defendants' motion. Defendants contend, on the basis of *Shaffer v. Heitner,* that Rule B(1) violates the due process clause of the fifth amendment because it permits this federal court "to exercise jurisdiction despite the absence of sufficient contacts among the defendants, the litigation, and [this district]."[15] Because there are superficial similarities between *Shaffer* and this action, *Shaffer* will be explored at length.

*Shaffer* holds, of course, that in cases involving a non-resident defendant, the jurisdiction of the state court is to be measured by the minimum contacts standard enunciated in *International Shoe Co. v. Washington.*[16] In other words, where a non-resident defendant is involved, *in rem* and *quasi-in-rem* jurisdiction are merged into *in personam* jurisdiction.

The facts of *Shaffer* are as follows: Heitner owned one share of stock in Greyhound Corporation which was incorporated in Delaware with its principal place of business in Arizona. He filed a shareholder's derivative suit in Delaware against Greyhound, its wholly owned subsidiary Greyhound Lines, and twenty-eight present or former officers or directors of one or both of the corporations, alleging that defendants had breached their duties to Greyhound by conducting unlawful activities in the State of Oregon. Pursuant to Delaware's sequestration statute, Heitner had 82,000 shares of Greyhound common stock belonging to nineteen of the individual defendants sequestered as well as options belonging to another two defendants. The purpose of the sequestra-

tion was to compel defendants to answer and defend the suit. Defendants challenged the sequestration on constitutional grounds. The Delaware courts upheld the validity of the statutes but the Supreme Court of the United States reversed:

> The Delaware courts rejected [defendants'] jurisdictional challenge by noting that suit was brought as a *quasi in rem* proceeding. Since *quasi in rem* jurisdiction is traditionally based on attachment or seizure of property present in the jurisdiction, not on contacts between the defendant and the State, the courts considered [defendants'] claimed lack of contacts with Delaware to be unimportant. This categorical analysis assumes the continued soundness of the conceptual structure founded on the century-old-case of *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565.[17]

The Court reexamined *Pennoyer v. Neff.* It determined that the jurisdictional parameters developed in *Pennoyer* were based on concepts of sovereignty. *Pennoyer* limited the jurisdiction of a state court to the persons or property found within the state's borders. Even out of state service was ineffectual.[18] The Court then traced the *in personam* wing of *Pennoyer* to the present and determined that it had "collapsed" upon the formulation of the minimum contacts standard of *International Shoe.*[19] Similarly, upon tracing the *in rem*[20] wing of *Pennoyer* to the present, the Supreme Court found that it had been sufficiently eroded to merit a reconsideration of its validity.[21]

Just as the *in personam* wing of *Pennoyer* collapsed under the weight of *International Shoe,* the Court, in section III of its opinion, used *International Shoe* to collapse the *in rem* wing of *Pennoyer.* It was persuaded to do so by the following argument:

15. 433 U.S. 186, 189, 97 S.Ct. 2569, 2572, 53 L.Ed.2d 683 (1977).

16. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

17. *Shaffer v. Heitner,* 433 U.S. at 196, 97 S.Ct. at 2576, 53 L.Ed.2d at 692.

18. *Id.* at 198, 97 S.Ct. 2569, 53 L.Ed.2d 683.

19. *Id.* at 205, 97 S.Ct. 2569, 53 L.Ed.2d 683.

20. The Court used *in rem* to refer to both *in rem* and *quasi-in-rem.* *Id.* at 199, n. 17, 97 S.Ct. 2569, 53 L.Ed.2d 683.

21. *Id.* at 206, 97 S.Ct. 2569, 53 L.Ed.2d 683.

The case for applying to jurisdiction *in rem* the same test of "fair play and substantial justice" as governs assertions of jurisdiction *in personam* is simple and straightforward. It is premised on recognition that "[t]he phrase, 'judicial jurisdiction over a thing,' is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing." [Cite omitted]. This recognition leads to the conclusion that in order to justify an exercise of jurisdiction *in rem,* the basis for jurisdiction must be sufficient to justify exercising "jurisdiction over the interests of persons in a thing." The standard for determining whether an exercise of jurisdiction over the interests of persons is consistent with the Due Process Clause is the minimum-contacts standard elucidated in *International Shoe.*[22]

In balancing this argument against those advanced in support of *in rem* jurisdiction, the Court specifically considered

> the significance of the long history of jurisdiction based solely on the presence of property in a State . . .. This history must be considered as supporting the proposition that jurisdiction based solely on the presence of property satisfies the demands of due process [cite omitted] but it is not decisive . . .. The fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification. Its continued acceptance would serve only to allow state-court jurisdiction that is fundamentally unfair to the defendant.[23]

Thus, the Supreme Court relegated the presence of property within a state to a mere indication of the presence of minimum contacts. It overruled its prior decisions to the extent that they are inconsistent with the standard of minimum contacts.[24] The Court went on to hold that Delaware did not have sufficient contacts to maintain jurisdiction over the defendants.

It is clear that this action bears some similarity to *Shaffer.* The primary purpose of the Delaware sequestration statute and Supplemental Rule B(1) is to compel the personal appearance of a non-resident defendant to answer and defend a suit brought against him through the seizure of any property which might be found in the geographical area over which the court has jurisdiction.[25] Similarly, I am asked to consider the constitutionality of an ancient form analogous to sequestration, the writ of "maritime" foreign attachment.[26] Finally, the only contacts which the defendants in this case appear to have with this district is the existence of a bank account in a local Seattle bank. This may be more substantial than the contacts the *Shaffer* defendants had with Delaware, but it is a limited contact nonetheless.

■ The test of due process is one of flexibility. It calls for "such procedural protections as the particular situation demands."[27] In *Shaffer* the Supreme Court essentially struck a new balance between competing aspects of jurisdiction, *in personam* "contacts" *vis a vis* "state sovereignty." It is now clear that "contacts" outweigh "sovereignty" when a state court seeks to compel a non-resident defendant to answer and defend a lawsuit. But in admiralty these interests have never been in substantial conflict; the action against property is

---

22. *Id.* at 207, 97 S.Ct. at 2581, 53 L.Ed.2d at 699 [footnotes omitted].

23. *Id.* at 211–212, 97 S.Ct. at 2584, 53 L.Ed.2d at 702–703.

24. *Id.* at 212, n. 39, 97 S.Ct. 2569, 53 L.Ed.2d 683.

25. *Id.* at 209, 97 S.Ct. 2569, 53 L.Ed.2d 683; *see Manro v. Almeida,* 23 U.S. (10 Wheat.) 473, 489, 6 L.Ed. 369 (1825).

26. "Maritime attachment" will be used to refer to foreign attachment in an admiralty context. "Attachment" is deemed to include the analogous process of garnishment.

27. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

the keystone of admiralty jurisprudence. Thus, the exercise of jurisdiction based on concepts of "sovereignty," that is, power over property, is central to the continued vitality of American admiralty jurisprudence.

Notwithstanding the similarities between this action and *Shaffer,* I am not persuaded that *Shaffer* alters the basis of admiralty jurisprudence. *Shaffer* does not of necessity invalidate the exercise of jurisdiction based solely on power over property; it can be distinguished on both constitutional and analytical grounds.

■ The autonomy of admiralty from the common law is of constitutional magnitude. The constitutional grant of judicial power conferred jurisdiction over admiralty and maritime matters independent of jurisdiction over matters in law and equity.[28] In the Process Act of 1789 Congress directed the federal courts to employ the "forms and modes of proceedings" of the civil law rather than the common law in admiralty and maritime cases.[29] The independence of admiralty was established by Congress in the Judiciary Act of 1789, as well.[30] This constitutional autonomy has been reaffirmed in recent times.

Of course all cases to which "judicial power" extends "arise," in a comprehensive, non-jurisdictional sense of the term, "under this Constitution." It is the Constitution that is the ultimate source of all "judicial Power"—defines grants and implies limits—and so "all Cases of admiralty and maritime Jurisdiction" arise under the Constitution in the sense that they have constitutional sanction. But they are not "Cases, in Law and Equity, arising under this Constitution, the Laws of the United States : . . ."[31]

The justification for maintaining the autonomy of admiralty jurisprudence derives from the maritime context in which admiralty is set. Admiralty deals with circumstances generally different from those of the common law.

Courts of admiralty are established for the settlement of disputes between persons engaged in commerce and navigation, who, on the one hand, may be absent from their homes for long periods of time, and, on the other hand, often have property or credits in other places. In all nations, as observed by an early writer, such courts "have been directed to proceed at such times, and in such manner, as might best consist with the opportunities of trade, and least hinder or detain men from their employments." [Cite omitted]. In the same spirit this court has more than once said: "Courts of admiralty have been found necessary in all commercial countries, for the safety and convenience of commerce and the speedy decision of controversies, where delay would often be ruin." [Cites omitted]. To compel suitors in admiralty (when the ship is abroad and cannot be reached by a libel in rem) to resort to the home of the defendant, and to prevent them from suing him in any district in which he might be served with a summons or his goods or credits attached, would not only often put them to great delay, inconvenience and expense, but would in many cases amount to a denial of justice.[32]

■ As suggested, maritime attachment is part and parcel of admiralty jurisprudence and has its justification in the maritime context. The history of maritime attachment itself indicates as well that the common law principles enunciated in *Shaffer* do not necessarily apply to it.

28. U.S.Const. art. III, § 2.

29. Act of Sept. 29, 1789, ch. 21, § 2, 1 Stat. 93–94.

30. Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 76–77. *See Atkins v. The [Fiber] Disintegrating Co.,* 85 U.S. (18 Wall.) 272, 21 L.Ed. 841 (1874).

31. *Romero v. Internat'l Term. Operating Co.,* 358 U.S. 354, 368, 79 S.Ct. 468, 478, 3 L.Ed.2d 368 (1959).

32. *Re Louisville Underwriters,* 134 U.S. 488, 493, 10 S.Ct. 587, 589, 33 L.Ed. 991, 994 (1890). *See also The Propeller COMMERCE [Comm'l Transportation Co. v. Fitzhugh],* 66 U.S. (1 Black) 574, 580–81, 17 L.Ed. 107, 109–110 (1862).

In *Manro v. Almeida*[33] the Supreme Court determined that maritime attachment was constitutionally recognized at the time the Constitution was adopted. In that case Manro sought to recover funds wrongfully taken by Almeida. Almeida left the country but specially appeared to the action filed by Manro pursuant to which an attachment of property belonging to Almeida was made. The district court dismissed the libel of Manro upon the demurrer of respondent Almeida. The Circuit Court affirmed.

On appeal the Supreme Court limited its inquiry to whether the libel was properly dismissed, that is, "whether the court below erred in refusing to the libellant the process of attachment on the case made out in his libel."[34] The Court could not consider the propriety of the lower court's order that the respondent's goods be restored.[35] This unusual procedural stance arose from the following events: The process of attachment was issued by the clerk rather than by court order, "and the respondent, instead of moving to quash it for irregularity, appeared to the libel, filed his demurrer, and was content to let the regularity of the attachment abide the decision of the court" upon the general questions raised by the respondent's demurrer to the libel.[36]

The key issue for the Court's consideration was whether the remedy of attachment was available in admiralty to compel an appearance of a respondent located outside of the court's jurisdiction as was respondent.[37] The resolution of this issue required the Court to determine if attachment was within the admiralty jurisprudence of the United States at the time the Constitution was adopted.[38] The Court traced the history of American maritime attachment from its civil law roots "of the remote ages,"[39] through the process acts of 1789 and 1792; the former requiring the courts to apply the practice of the civil law to cases of admiralty,[40] and the latter directing the courts to employ procedures "according to the principles, rules and usages, which belong to courts of admiralty, as contradistinguished from courts of common law."[41]

In giving a construction to the act of 1792, it is unavoidable that we should consider the admiralty practice there alluded to, as the admiralty practice of our own country, as engrafted upon the British practice; it is known to have had some peculiarities which have been incorporated into the jurisprudence of the United States. We had then been sixteen years an independent people, and had administered the admiralty jurisdiction as well in admiralty courts of the states, as in those of general government; and if, in fact, a change had taken place in the practice of the two countries, that of our own certainly must claim precedence. On the subject particularly under consideration, it appears from an English writer, that the practice of issuing attachments had been discontinued in the English courts of admiralty, while in some of our own courts it was still in use, perhaps not so generally as to sanction our sustaining it altogether on authority, were we not of opinion, that it has the highest sanction also, as well in principle as in convenience.[42]

Thus, the Court found that maritime attachment was indeed a part of American admiralty jurisprudence. It went on to hold that the libel should not have been dismissed since it substantially satisfied the

33. 23 U.S. (10 Wheat.) 473, 6 L.Ed. 369 (1825).

34. *Id.* at 485, 6 L.Ed. 372.

35. *Id.*

36. *Id.*

37. *Id.* at 487–88, 6 L.Ed. 372.

38. *Id.* at 488, 6 L.Ed. 372.

39. *Id.* at 490, 6 L.Ed. 373.

40. *See* text accompanying note 29, *supra.*

41. *Id.* at 488, 6 L.Ed. 372; Act of May 8, 1792, ch. 36, § 2, 1 Stat. 276.

42. *Manro v. Almeida,* 23 U.S. (10 Wheat.) at 489–90, 6 L.Ed. at 373.

pleading and procedural requirements of the time.[43]

It is clear that maritime attachment has remained a part of admiralty jurisprudence since *Manro*. In 1842 Congress empowered the Supreme Court to promulgate admiralty rules.[44] Two years later the Court adopted its first set of rules. Rule 2 provided for maritime attachment when the defendant could not be found within the district:

> In suits *in personam,* the mesne process may be by a simple warrant of arrest of the person of the defendant, in the nature of a capias, or by a warrant of arrest of the person of the defendant, with a clause therein, that if he cannot be found, to attach his goods and chattels to the amount sued for; or if such property can not be found, to attach his credits and effects to the amount sued for in the hands of the garnishees named therein; or by a simple monition, in the nature of a summons to appear and answer to the suit, as the libellant shall, in his libel or information, pray for or elect.[45]

The rules of 1844 were superseded by the Admiralty Rules of 1920 which did not enact any substantial change,[46] including the revision of Rule 2, reading:

> In suits *in personam* the mesne process shall be by a simple monition in the nature of summons to appear and answer to the suit, or by a simple warrant of arrest of the person of the respondent in the nature of a capias, as the libellant may, in his libel or information, pray for or elect; in either case, with a clause therein to

attach his goods and chattels, or credits and effects in the hands of the garnishees named in the libel to the amount sued for, if said respondent shall not be found within the district. But no warrant of arrest of the person of the respondent shall issue unless by special order of the court, on proof of the propriety thereof, by affidavit or otherwise.[47]

A comparison of these rules establishes that the traditional remedy of maritime attachment was included in both and was available only if the respondent could not be found.

Supplemental Rule B(1) is the direct descendant of Admiralty Rule 2. It was promulgated in 1966 as part of the unification of civil and admiralty procedure. According to the Advisory Committee which formulated the rules:

> [B(1)] preserves the traditional maritime remedy of attachment and garnishment, and carries forward the relevant substance of Admiralty Rule 2 . . .. The rule follows closely the language of Admiralty Rule 2. No change is made with respect to the property subject to attachment. No change is made in the condition that makes the remedy available. . . .[48]

 I am convinced that maritime attachment is constitutionally permissible. The recognized autonomy of admiralty jurisprudence, although not absolute,[49] and the long constitutional viability of maritime attachment compel me to conclude that *Shaffer* does not reach Rule B(1) attachment.[50]

---

**43.** This aspect of the case is addressed *infra.*

**44.** Act of Aug. 23, 1842, ch. 188, § 6, 5 Stat. 518.

**45.** *Reprinted in* 7A Moore's Federal Practice ¶ .30 at 224 (1977). *See Atkins v. Fiber Disintegrating Co.,* 85 U.S. (18 Wall.) at 304–305, 21 L.Ed. at 845.

**46.** 7A Moore's Federal Practice ¶ .21[1] at 201 (1977).

**47.** *Reprinted in* 7A Moore's, *supra* n. 45, at 223–24.

**48.** 28 U.S.C. Supplemental Rule B, Note of Advisory Committee on Rules, at 7864 (1970).

**49.** *See Swift & Co. v. Compania Colombiana Del Caribe, S. A.,* 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950).

**50.** Whether *Shaffer* reaches states remedies provided via Rule B(1) is not before me. *Cf. Grevas v. M/V OLYMPIC PEGASUS,* 557 F.2d 65 (4th Cir. 1977), *cert. denied,* 434 U.S. 969, 98 S.Ct. 515, 54 L.Ed.2d 456 (1977) (service of process made pursuant to F.R.C.P. 4 and state long arm statute must meet minimum contacts standard).

This conviction is further supported on purely analytical grounds as well. First, maritime attachment does not rest on the viability of *Pennoyer v. Neff.* Second, unlike the trend in the common law noted in *Shaffer,*[51] the modern trend in admiralty has been to strengthen traditional admiralty remedies against property, rather than to erode them.[52]

It is my opinion that *Shaffer v. Heitner* is inapplicable to Rule B(1) on either constitutional or analytical grounds. Accordingly, defendants' first challenge fails.

Defendants next challenge the procedure under which their bank account was garnished. They contend that Rule B(1) violates the principles of procedural due process. They particularly direct this Court's attention to *North Georgia Finishing v. Di-Chem.*[53] In that case the Supreme Court invalidated the Georgia garnishment statutes under which petitioner's bank account had been garnished since the statutes failed to protect against a mistaken deprivation of property.[54]

There is merit in defendants' assertion that *Di-Chem* is almost completely in point with the case at bar. Both cases involve procedural rather than substantive rights. Both cases involve a commercial rather than a consumer setting. In either case, a corporate plaintiff has garnished a bank account of a corporate defendant.

The garnishment procedure is also similar:

The writ of garnishment is issuable on the affidavit of the creditor or his attorney, and the latter need not have personal knowledge of the facts. [Cite omitted]. The affidavit . . . need contain only conclusory allegations. The writ is issuable, as this one was, by the court clerk, without participation by a judge. Upon service of the writ, the debtor is deprived of the use of the property in the hands of the garnishee. Here a sizeable bank account was frozen . . .. There is no provision for an early hearing at which the creditor would be required to demonstrate at least probable cause for the garnishment.[55]

The only difference between *Di-Chem* and this action which might justify the B(1) procedure is that this is an action in admiralty.

Plaintiff relies primarily on *Fuentes v. Shevin*[56] in asserting that the admiralty nature of this action justifies the procedure employed. In *Fuentes* the Supreme Court invalidated the prejudgment replevin statutes of Florida and Pennsylvania for failure to provide for hearings at a meaningful time, that is, before seizure.[57] The Court recognized, however, that extraordinary situations exist which justify postponing notice and opportunity for a hearing.[58]

These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a governmental offi-

---

51. *Shaffer v. Heitner,* 433 U.S. at 205–06, 97 S.Ct. 2569, 53 L.Ed.2d 683, *see* text accompanying note 21, *supra.*

52. *See* Maritime Lien Act, 46 U.S.C. § 973, (as amended in 1971) *construed in, Lake Union Drydock Co. et al. v. M/V POLAR VIKING,* 446 F.Supp. 1286 (W.D.Wash. 1978).

53. 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

54. *See Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, *reh. denied,* 409 U.S. 902, 93

S.Ct. 177, 34 L.Ed.2d 165 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

55. *North Georgia Finishing v. Di-Chem,* 419 U.S. at 607, 95 S.Ct. at 722, 42 L.Ed.2d at 757.

56. 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

57. *Id.* at 80, 92 S.Ct. 1983, 32 L.Ed.2d 556.

58. *Id.* at 90, 92 S.Ct. 1983, 32 L.Ed.2d 556.

cial responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food.[59]

■ To come within the exception of *Fuentes*, plaintiff must establish all three requisites. If it fails on any one, the exception will not be available. Plaintiff first argues that the assertion of an admiralty court's jurisdiction is alone enough to satisfy the governmental purpose requisite of the *Fuentes* trilogy. I do not agree.

Plaintiff's reliance on *Calero-Toledo v. Pearson Yacht Leasing Co.*[60] is misplaced. That case involved the seizure and forfeiture of a yacht being used to transport marijuana. The Court held, *inter alia,* that the seizure and forfeiture met the governmental purpose requirement of *Fuentes*.

First, seizure under the Puerto Rican statutes serves significant governmental purposes: Seizure permits Puerto Rico to assert *in rem* jurisdiction over the property in order to conduct forfeiture proceedings, thereby fostering the public interest in preventing continued illicit use of the property and in enforcing criminal sanctions.[61]

In *Calero-Toledo* the mere assertion of jurisdiction was not in and of itself sufficient;

it was in aid of an important governmental or public interest. Unlike the situation in *Fuentes*, seizure was not initiated by self-interested private parties.[62]

Plaintiff's reliance upon *Ownbey v. Morgan*[63] is similarly unavailing. In *Fuentes* the Supreme Court distinguished three previous cases in which it had permitted the attachment of property without a prior hearing.[64] *Ownbey* was cited as a case which "involved attachment necessary to secure jurisdiction in state court—clearly a most basic and important public interest."[65] The key issue in *Ownbey,* however, was whether the non-resident owner of attached property could be precluded from entering an appearance and defending the action until he posted security for the attached property. The *Ownbey* Court held that such a procedure was not violative of due process. The continued vitality of *Ownbey* is now certainly questionable, especially in light of *Shaffer v. Heitner.*[66] The true test of when attachment to secure jurisdiction constitutes an important public interest is found, therefore, in *Calero-Toledo* which actually applied the *Fuentes* test.

I am satisfied that the present action does not involve a furtherance of a governmental or public interest.[67] The situation at hand cannot be classed as "truly unusual."[68] Nothing more than private gain is directly at stake.[69] Since this case does not satisfy the governmental purpose prong of *Fuentes*, the other prongs need not be discussed.

---

**59.** *Id.* at 90–92, 92 S.Ct. at 2000, 32 L.Ed.2d at 575–576 [footnotes omitted].

**60.** 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452, reh. denied, 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974).

**61.** *Id.* at 679, 94 S.Ct. at 2089, 40 L.Ed.2d at 465 [footnote omitted].

**62.** *Id.*

**63.** 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921).

**64.** *Fuentes v. Shevin,* 407 U.S. at 91, n. 23, 92 S.Ct. at 1999, 32 L.Ed.2d at 576.

**65.** *Id.*

**66.** 433 U.S. at 212 & n. 10, 97 S.Ct. 2569, 53 L.Ed.2d 683. *See Jonnet v. Dollar Savings Bank of the City of New York,* 530 F.2d 1123, 1128 (3rd Cir. 1976).

**67.** *But see, Central Soya v. Cox Towing,* 417 F.Supp. 658 (N.D.Miss.1976). *See also Techem Chemical Co., Ltd. v. M/T CHOYO MARU,* 416 F.Supp. 960 (D.Md.1976).

**68.** *Fuentes v. Shevin,* 407 U.S. at 90, 92 S.Ct. 1983, 32 L.Ed.2d 556.

**69.** *Id.* at 92, 92 S.Ct. 1983, 32 L.Ed.2d 556.

Plaintiff's contention that the procedure used in this action satisfies *Mitchell v. W. T. Grant* [70] is without merit. In *Mitchell* the Supreme Court upheld Louisiana's sequestration act although it did not require a pre-seizure hearing. The act protected the "debtor's interest in every conceivable way, except allowing him to have the property to start with . . . ." [71] The writ could issue without notice or opportunity for a hearing only upon a clear showing to a judge that the creditor had a right to possession; conclusory allegations of ownership or possessory rights would not suffice. Furthermore, the writ could issue only after the creditor seeking the writ had filed a bond sufficient to protect the debtor against all damages should the deprivation of property prove to be mistaken. Finally, the debtor was immediately entitled to seek dissolution of the writ, which would be ordered unless the creditor could prove the grounds upon which the writ was issued. [72]

Here the writ was issued by the clerk upon a complaint and an affidavit that defendants could not be found within the district. Both were verified by plaintiff's counsel alone. There is no indication that he had actual knowledge of the events set forth in the complaint, nor is the complaint verified or supported by affidavit of anyone purporting to have such knowledge. The material allegations of the complaint are, thus, necessarily based on hearsay and some are, in fact, based on information and belief. The affidavit that defendants could not be found is also based on information and belief. There is no indication as to what steps, if any, were taken to determine whether defendants were indeed within the district. Furthermore, the writ issued without judicial participation; the clerk issued it as of course. In addition, there is no provision for an immediate post-seizure hearing in this district. [73]

Nor does a balancing of interests justify the summary procedure employed in this case. The vitality of maritime commerce depends as much on the availability of protections against the mistaken summary deprivation of the property of maritime defendants as it does on the availability of speedy remedies for maritime plaintiffs. "Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken." [74]

Finally, it is urged that the procedure employed pursuant to Rule B(1) satisfies due process because it was in existence at the time the Constitution was adopted, and that the issue now being considered was previously decided in 1825 in *Manro v. Almeida.* I disagree.

Taking the latter contention first, it is clear that the Supreme Court discussed attachment procedure in *Manro v. Almeida,* [75] but its holding was limited to whether the form of the libel was sufficient to merit the process of attachment. It did not reach the question whether the court clerk could issue the writ as of course, as was done in the present action.

> The last point made in argument was, whether the process of attachment could issue without an order of the judge. But here, again, we have to remark, that we can take no notice of the circumstances under which the writ actually did issue. And looking to the libel, it appears to

**70.** 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).

**71.** *Id.* at 618, 94 S.Ct. at 1905, 40 L.Ed.2d at 419.

**72.** *Id.* at 605–606, 94 S.Ct. 1895, 40 L.Ed.2d 412.

**73.** *But see, Amstar Corp. v. M/V ALEXANDROS T.,* 431 F.Supp. 328 (D.Md.1977).

**74.** *Fuentes v. Shevin,* 407 U.S. at 90, n. 22, 92 S.Ct. at 1999, 32 L.Ed.2d at 576. Maritime attachment has resulted in the wrongful deprivation of property. *See, e. g., Techem Chemical Co., Ltd. v. M/T CHOYO MARU,* 416 F. Supp. 960 (D.Md.1976); *Artinano v. W. R. Grace & Co.,* 286 F. 702 (E.D.Va.1923); *Shewan v. Hallenbeck,* 150 F. 231 (S.D.N.Y.1906).

**75.** 23 U.S. (10 Wheat.) 473, 6 L.Ed. 369 (1825).

have been its express object to obtain such an order from the court.[76]

As to the former contention, the history of attachment procedure is not difficult to trace. It indicates that the present procedure used to invoke attachment bears "little resemblance" to that in existence when the Constitution was adopted.[77] Prior to *Manro,* maritime attachment was auxiliary to arrest; "a writ of maritime attachment was issued only after the marshal or his deputy had returned a warrant of arrest *in personam* that the defendant could not be found within the district."[78]

> If the respondent was found and served but failed to appear, a writ of foreign attachment could also be obtained from the court "for contumacy after, monition." [Cites omitted]. The writ of foreign attachment issued neither as of course nor in the first instance, but only after an order of the court because of the respondent's contumacy or the inability of the Marshal to find him.[79]

Since arrest required a court order,[80] the writ of maritime attachment, as auxiliary to arrest, could not issue without the issuance of two judicial monitions, one for arrest and one for attachment should the marshal be unable to find the respondent.

This procedure remained constant until it was streamlined in *Manro.* There, the

Court indicated that it was not improper to issue the writ of attachment simultaneously with the monition where the libel prayed for it.[81] Thereafter, one court order could stand in the place of two.

Judicial participation was required at least until 1844 when Admiralty Rule 2 was first promulgated.[82] It is clear, therefore, that present attachment procedure is much different from that employed during the early years of our nation. In fact, maritime defendants had greater procedural protection then than now.

I am convinced that the fact that this is an admiralty action is insufficient to justify the procedure employed to seize defendants' bank account pursuant to Rule B(1). I can find no indication that maritime defendants may be constitutionally due less procedural protection against the mistaken deprivation of property than non-maritime defendants.[83]

By way of summation, I find that (1) the admiralty remedy of maritime attachment is constitutionally sound and may provide the jurisdictional basis for an action in admiralty despite the absence of minimum contacts; and (2) the procedure prescribed by Rule B(1) is insufficient to protect defendants from the mistaken deprivation of property.[84] I am compelled, therefore, to

---

76. *Id.* at 495–96, 6 L.Ed. 374.

77. *Fuentes v. Shevin,* 407 U.S. at 78, 92 S.Ct. 1983, 32 L.Ed.2d 576.

78. *Maryland Tuna Corp. v. M/S BENARES,* 429 F.2d 307, 320 (2nd Cir. 1970); *Smith v. Miln.,* 22 F.Cas. 603, 605 (No. 13,081) (C.C.S.D.N.Y. 1848).

79. *D/S A/S Flint v. Sabre Shipping Corp.,* 228 F.Supp. 384, 387 (E.D.N.Y.1964), *aff'd,* 341 F.2d 50 (2nd Cir. 1965).

80. *See Manro v. Almeida,* 23 U.S. (10 Wheat.) at 490–91, 6 L.Ed. 369.

81. *Id.* at 496, 6 L.Ed. at 374.

82. *See Maryland Tuna v. M/S BENARES,* 429 F.2d at 320; *D/S A/S Flint v. Sabre Shipping Corp.,* 228 F.Supp. at 387.

83. *See,* Minutes of Proceedings of Maritime Law Association of Nov. 4, 1977, Minority Report of the Committee on Practice and Procedure on the Admiralty Arrest and Attachment Rules, at 6786–6793.

84. What procedure would be constitutional is not before me. I take the liberty of suggesting, however, that if Rule B(1) was amended to incorporate the proposed amendment of *amicus* Maritime Law Association (as it applies to attachment) which affords the defendant an immediate opportunity to vacate the attachment by securing a show cause order against the plaintiff, *id.,* Report of Committee on Practice and Procedure, Proposed Amendment to Supplemental Rules, at 6783–84, accompanied by a simple mandatory provision requiring judicial participation for the issuance of the writ, the constitutional infirmity would be cured.

The nature of judicial participation to be required is also not before me. A formal hearing is probably unnecessary. Given the transitory nature of maritime property and the necessity for prompt action, the writ could issue *ex-parte* by convincing the court, even by a showing

find Rule B(1) unconstitutional. In doing so, I dislike condemning a rule which has existed for so many years but the constitutional principles enunciated in *Fuentes* and *Di-Chem* require it.[85]

Accordingly, defendants' motion to dismiss is granted.

While I have not agreed with *amici curiae* in all respects, I very much appreciate their interest and assistance.

based on reliable hearsay testimony, that reasonable cause exists for the issuance of the writ. The party seeking the writ should at least be required to show that a maritime debt probably exists, and to describe with particularity its efforts to locate the defendant in the district. Mere conclusory allegations should not suffice.

This suggested procedure would be much more reliable than the one invoked in this case, where the writ issued essentially on a hearsay complaint and conclusory affidavit without any judicial inquiry.

**85.** This case is solely *in personam*. There are substantive differences between *in personam* and *in rem* proceedings. Whether the principles enunciated herein are applicable to *in rem* actions has not been considered.