SCHIFFAHARTSGESELLSCHAFT LE-
ONHARDT & CO. (G.M.B.H. &
CO.), Plaintiff,

v.

A. BOTTACCHI S.A. DE NAVEGACION,
Defendant.

No. CV482–201.

United States District Court,
S.D. Georgia,
Savannah Division.

Dec. 9, 1982.

772

Robert Glenn, Jr., Lamar C. Walter, Savannah, Ga., for plaintiff.

Lamar C. Walter (Chamlee, Dubus, Sipple & Walter), Savannah, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

The Court has before it the defendant's motion pursuant to Supplemental Rule E(8),

Fed.R.Civ.P., to dismiss the complaint and quash the process of maritime attachment and garnishment. The defendant contends that the Court lacks personal jurisdiction over it and that the issuance of process of maritime attachment and garnishment under Admiralty Rule B(1), Fed.R.Civ.P., violates its right to due process of law guaranteed by the Fifth Amendment to the United States Constitution.

### Procedural Background

The plaintiff Schiffahartsgesellschaft Leonhardt & Co. (G.M.B.H. & Co.) (hereinafter referred to as "Leonhardt") filed its complaint in admiralty and petition to compel arbitration against defendant A. Bottacchi S.A. De Navegacion (hereinafter referred to as "Bottacchi") on May 24, 1982. The plaintiff alleged that the defendant is a foreign corporation organized and existing under the laws of Argentina and that no officer could be found within this district but that certain property belonging to the defendant, the vessel M/V Puntas Malvinas, was or would be within this district during the pendency of the action. The plaintiff's attorney submitted an affidavit signed by him in support of the assertion that the defendant could not be found within the Southern District of Georgia. The facts giving rise to the institution of this suit as alleged in the complaint are as follows:

The defendant time-chartered the plaintiff's vessel, the M/V Barbara Leonhart, by a New York Produce Exchange Charter Party dated March 16, 1982. On or about April 14, 1982, while operating under the charter party on a voyage between St. John, New Brunswick, Canada, and Buenos Aires, Argentina, the M/V Barbara Leonhart encountered bad weather during which she and her cargo were damaged, allegedly due to the defendant's negligence and breach of contract. Upon arrival in Buenos Aires, the plaintiff was required to post security in the amount of $450,000.00 to secure the claims of the cargo recipients for the cargo lost or damaged during the voyage. Contending that it is entitled to indemnity and/or contribution from defend-

ant with respect to any liability which may be adjudged against it in favor of the cargo interests (together with costs, expenses, and attorney's fees, and damages for the injury to the vessel and the posting of security), the plaintiff sought the issuance of a summons with process of attachment and garnishment against the defendant's vessel, the M/V Puntas Malvinas. On May 25, 1982, the plaintiff amended its complaint after discovering that the defendant was not the owner of the M/V Puntas Malvinas, but the bareboat charterer, and prayed for issuance of process of attachment and garnishment against certain bunkers and stores owned by the defendant aboard the vessel M/V Puntas Malvinas, as well as against certain freights and subfreights due the defendant. The summons was issued by the court clerk against the vessel on May 24, 1982, and against the bunkers and freights on May 25, 1982. On May 26, the parties came before the Court and argued the constitutionality of Admiralty Rule B(1). The vessel was released as were the bunkers and freights after the defendant posted security pursuant to Rule E(5).

The defendant filed its motion to dismiss on June 4, asserting a lack of jurisdiction over the person of the defendant because the defendant is not the owner of the vessel attached and has not been personally served and arguing the unconstitutionality of Admiralty Rule B(1). The parties have submitted briefs and the Court again heard oral argument.

### The Contention of the Parties

The initial attachment of the M/V Puntas Malvinas in this case demonstrates the fallibility of Rule B(1), according to the defendant's argument that Rule B(1) is unconstitutional because it does not provide adequate safeguards to protect against wrongful or mistaken deprivation of property. The defendant does not argue that the plaintiff did not follow the procedures set forth in Rule B. Moreover, the defendant cannot argue that *as applied* in its case Rule B violated its constitutional right to due process, since the defendant's agent

received prior notice of the attachment and an opportunity for a prompt post-seizure hearing was afforded defendant. Bottacchi attacks the Rule on its face, contending that the issuance of the summons with process of attachment and garnishment by the court clerk upon the plaintiff's submission of a complaint and affidavit containing conclusory allegations, without provision for prior notice or a preseizure or prompt post-seizure hearing, violates its right to procedural due process guaranteed by the Fifth Amendment of the United States Constitution.[1] The defendant's position, though not expressly articulated, relies on the application to Rule B(1) of the due process principles set forth in the Supreme Court's line of decisions in the area of state creditor's rights statutes, *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); and *North Georgia Finishing Co. v. Dichem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

The plaintiff ably presents the counter-argument that the considerations of due process in the admiralty context are different from those in state attachment proceedings because of the unique character of commercial practices in admiralty. Thus, the plaintiff urges, the process due the defendant is not the same process due the debtors in the *Sniadach* line of cases. The plaintiff argues that Rule B(1), as supplemented by the Federal Rules, local rules, and the court's inherent equitable power in admiralty, ensures the defendant all the process to which it is due.

---

1.  Rule B(1) provides:

     With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees named in the complaint to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or his attorney that, to the affiant's knowledge, or to the best of his information and belief,

## Court's Commentary

That the admiralty rules of maritime seizure are not beyond attack, and even invalidation, has been well established in recent years by the initiation of suits questioning their constitutionality in light of *Sniadach* and its progeny and *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Though the case before the Court raises no challenge to Admiralty Rule C which governs actions *in rem* and does not broach the jurisdictional issue under *Shaffer,* some discussion of *in rem* actions and *quasi in rem* jurisdiction will be necessary.

Rules B and C "permit seizures pursuant to a warrant issued by the *ex parte* application of a party to the clerk of a federal district court without requiring that the owner of such property be given prior notice or an opportunity to be heard." Batiza & Partridge, *The Constitutional Challenge to Maritime Seizures,* 26 Loyola L.Rev. 203, 211 (1980). Though similar procedurally, the purposes of the two rules are quite different and any discussion of their constitutionality must take into account the critical distinctions. Rule B governs *in personam* actions instituted by attachment of the defendant's property if the defendant cannot be found within the district for personal service. Its salutary purpose is to permit suits in any district in which the defendant's property may be attached thereby obviating the need to follow the defendant to his residence. Though Rule B is, in theory, a device for obtaining personal jurisdiction over the defendant, in practice it is often used as a means of securing the plaintiff's claim. *Maritime Seizures, supra,* at 213.

the defendant cannot be found within the district. When a verified complaint is supported by such an affidavit the clerk shall forthwith issue a summons and process of attachment and garnishment. In addition, or in the alternative, the plaintiff may, pursuant to Rule 4(e), invoke the remedies provided by state law for attachment and garnishment or similar seizure of the defendant's property. Except for Rule E(8) these Supplemental Rules do not apply to state remedies so invoked.

Where the plaintiff has acquired a maritime lien in any of the numerous ways by which it may do so, an action *in rem* will lie and Rule C will provide the means for enforcing the lien by authorizing the arrest of the vessel. The viability of an action *in rem* to enforce a maritime lien depends intrinsically upon the court's acquisition of custody of the vessel pursuant to Rule C. *Maritime Seizures, supra,* at 212. This is so because a maritime lien, unlike a common law lien, is actually a property right in the vessel which arises at the moment of the event which creates the lien. *Amstar Corporation v. S/S Alexandros T.,* 664 F.2d 904, 908–09 (4th Cir.1981); *see generally,* Gilmore & Black, *The Law of Admiralty,* §§ 9–1, 9–2, at 586–89. The presence of the maritime lien, as a substantive element of maritime law, distinguishes Rule C arrest from Rule B attachment. *Compare Grand Bahama Petroleum Co., Ltd. v. Canadian Transportation Agencies, Ltd.,* 450 F.Supp. 447 (W.D.Wash.1978) *with Kodiak Fishing Co. v. M/V Pacific Pride,* 535 F.Supp. 915 (W.D.Wash.1982). The action lies against the vessel herself and Rule C arrest provides the means of satisfying the lien. *Amstar Corp., supra,* at 909. Thus, Rule C is not merely a procedural device to obtain jurisdiction over the owner; this characterization more accurately describes the theoretical purpose of Rule B.

As I have already noted, though their purposes are markedly different, the procedures provided in Rules B and C are very similar: Upon the filing of a verified complaint stating "the circumstances from which the claim arises with such particularity that the defendant or claimant will be able ... to commence an investigation of the facts and to frame a responsive answer," Admiralty Rule E(2)(a), the clerk may forthwith issue a summons and process of attachment and garnishment or a warrant for the arrest of the vessel. Under Rule B, an affidavit signed by the plaintiff or his attorney must accompany the complaint stating that "to the affiant's knowledge or to the best of his information and belief, the defendant cannot be found within the district." There is no provision for prior notice and the Advisory Committee "assumed that the garnishee or custodian of the property attached will ... notify the defendant. ..." Advisory Committee's Notes to Admiralty Rule B(2). Nor is there any provision for a pre- or post-seizure hearing or for judicial supervision of the issuance of the process or the warrant.

The absence of safeguards, such as judicial supervision, specific factual allegations, notice and an opportunity to contest the seizure, to protect against mistaken or wrongful attachments or arrests has given rise to the procedural due process challenges. The substantive due process attacks began after *Shaffer v. Heitner* "established, as a matter of due process under the Fourteenth Amendment, that a state court could not exercise jurisdiction over a defendant's property where a court would not have jurisdiction over the defendant's person." *Maritime Seizures, supra,* at 210. Rule B provides the same method of obtaining jurisdiction over the defendant as the Delaware sequestration statute involved in *Shaffer.* Notwithstanding the surface similarities, the district court in the influential case of *Grand Bahama Petroleum Co., supra,* set the tone for most subsequent treatments of the relevance of *Shaffer* in the maritime seizure context by ruling that *Shaffer* "is inapplicable to Rule B(1) on either constitutional or analytical grounds." 450 F.Supp. at 456. In reaching this conclusion, Judge Beeks relied on the distinct nature of admiralty as separate from the common law and the autonomy of admiralty both of which derive from the independent source of judicial power in admiralty, U.S.Const. art. III, § 2, and on the historical significance of maritime attachment in admiralty jurisprudence. 450 F.Supp. at 452–54. After tracing the history of Admiralty Rule B(1), he held that "[t]he recognized autonomy of admiralty jurisdiction, although not absolute, and the long constitutional viability of maritime attachment compel me to conclude that *Shaffer* does not reach Rule B(1) attachment." 450 F.Supp. at 455. On the whole, the rationale and ruling of *Grand Bahama* have been

followed. *See, e.g., Hjalmar Bjorges Rederi v. Tugboat Condon,* 1979 A.M.C. 1696 (S.D. Cal.1976). *But see Engineering Equipment Co. v. S/S Selene,* 446 F.Supp. 706 (S.D.N.Y. 1978).

Interestingly, the articulation in *Grand Bahama* of the historical and constitutional grounds for rejecting a challenge to the *quasi in rem* nature of Rule B(1), has been adopted by later courts in upholding Rules B and C against procedural due process challenges. *See, e.g., Amstar Corp. v. S/S Alexandros T.,* 664 F.2d 904 (4th Cir.1981); *Merchants National Bank v. Dredge General G.L. Gillespie,* 663 F.2d 1338 (5th Cir. 1981). But Judge Beeks himself did not find such reasoning persuasive in confronting the *Sniadach* line of cases. Instead, while acknowledging the historical importance of maritime attachment, he found that the Rule in its present form provides less protection than the procedures used before 1844. 450 F.Supp. at 459. The historical significance rationale was thus much weaker when the *procedural,* as opposed to *substantive,* validity of the rule was considered. In light of the pronouncements in *Sniadach, Fuentes, Mitchell,* and *North Georgia Finishing,* the court in *Grand Bahama* found Rule B(1) "insufficient to protect defendants from the mistaken deprivation of property." 450 F.Supp. at 459. Judge Beeks suggested that the defect could be cured by amendment of Rule B(1) to provide for an immediate opportunity for a post-seizure hearing and for judicial supervision of the issuance of the writ. 450 F.Supp. at 459 n. 84.

The *Grand Bahama* interpretation of the *Sniadach* line of cases has by no means been readily accepted. *See, e.g., Amstar Corp., supra,* at 910. Thus, most courts have engaged in a *de novo* review of the somewhat inconsistent messages delivered by the Supreme Court in *Sniadach, Fuentes, Mitchell,* and *North Georgia Finishing.*

In *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), the court considered the validity of a wage garnishment procedure which did not provide for prior notice or hearing. Justice Douglas without extended argument concluded that "absent notice and a prior hearing (cit.) this prejudgment garnishment violates the fundamental principles of due process." *Id.* at 342, 89 S.Ct. at 1823. He commented, however, that "in extraordinary situations," notice and a prior hearing could be dispensed with. *Id.* at 339, 89 S.Ct. at 1821. In *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the court extended *Sniadach's* conception of due process to include seizure of *any* property where no pre-seizure notice and opportunity to challenge the seizure were provided. The replevin statutes at issue allowed private parties on *ex parte* application to obtain prejudgment writs of replevin. The writ would be issued after the recitation in a conclusory manner of the reasons supporting the application for the writ and after the posting of a security bond. The court also elaborated on *Sniadach's* passing reference to "extraordinary situations" which would warrant the postponement of notice and a hearing:

First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a governmental official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

407 U.S. at 91, 92 S.Ct. at 2000. The court cited as an example, *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), a case which, according to the court, involved "attachment necessary to secure jurisdiction in state court—clearly a most basic and important public interest." *Id.* at 91 n. 23, 92 S.Ct. at 1999 n. 23.

The court found the "extraordinary situations" test to be met in *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). The Puerto Rican government had seized the plaintiff's yacht under a Commonwealth

statute providing for the seizure and forfeiture of vessels used to transport controlled substances:

> First, seizure under the Puerto Rican statutes serves significant governmental purposes: Seizure permits Puerto Rico to assert *in rem* jurisdiction over the property in order to conduct forfeiture proceedings, thereby fostering the public interest in preventing continued illicit use of the property and in enforcing criminal sanctions. Second, pre-seizure notice and hearing might frustrate the interests served by the statutes, since the property seized—as here, a yacht—will often be of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given. And, finally, unlike the situation in *Fuentes,* seizure is not initiated by self-interested private parties; rather, Commonwealth officials determine whether seizure is appropriate under the provisions of the Puerto Rican statutes.

416 U.S. at 679, 94 S.Ct. at 2089–90 (footnote omitted).

Two days prior to the decision in *Calero-Toledo,* the court handed down its decision in *Mitchell v. W.T. Grant,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), which was authored by the dissenter in *Fuentes,* Justice White. At first glance, *Mitchell* appeared to overrule *Fuentes, see* 416 U.S. at 629–36, 94 S.Ct. at 1910–14 (Stewart, J., dissenting), by upholding a Louisiana sequestration statute which permitted seizures without pre-deprivation notice or opportunity to be heard. The court distinguished the statutes involved in *Fuentes* by noting that the Louisiana statute provided safeguards lacking from those statutes: (1) judicial control of the issuance of the writ; (2) specific, factual allegations in the supporting affidavit; (3) posting of a security bond by the creditor; (4) opportunity to seek dissolution of the writ contingent upon creditor's proof of grounds for the issuance of the writ. Echoing his dissent in *Fuentes,* Justice White expressed his concern for the interests of both the debtor and the creditor. He was particularly bothered by the danger that property left in the debtor's hands would deteriorate or would be sold, concealed or otherwise disposed of, thus depriving the creditor of *his* property right in the goods. 416 U.S. at 605, 94 S.Ct. at 1899. "The danger of destruction or alienation cannot be guarded against if notice and a hearing before seizure are supplied." *Id.* at 609, 94 S.Ct. at 1901. Balancing the interests of the creditor and debtor, the court concluded that

> the Louisiana system seeks to minimize the risk of error of a wrongful interim possession by the creditor. The system protects the debtor's interest in every conceivable way, except allowing him to have the property to start with, and this is done in pursuit of what we deem an acceptable arrangement *pendente lite* to put the property in the possession of the party who furnishes protection against loss or damage to the other pending trial on the merits.

*Id.* at 618, 94 S.Ct. at 1905.

Again, in *North Georgia Finishing, Inc. v. Di-chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), the court engaged in a balancing of interests and found that a Georgia statute, which allowed the issuance of a process of garnishment by a clerk of court upon the filing of a conclusory affidavit and of a bond, without notice or a pre- or post-garnishment hearing, violated the Fourteenth Amendment due process clause. The Georgia statute had "none of the saving characteristics of the Louisiana statute." *Id.* at 607, 95 S.Ct. at 722. The court did not find material the fact that, unlike the debtors in *Fuentes* and *Mitchell,* the debtor in *North Georgia Finishing* was a corporation as was the garnishor. Nor was the posting of a security bond sufficient to protect the debtor against the "risk of initial error." 419 U.S. at 608, 95 S.Ct. at 723. The court made clear that it would not "distinguish among different kinds of property in applying the Due Process Clause." *Id.*

Last term, the Supreme Court in *Lugar v. Edmondson Oil Co.,* —— U.S. ——, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), explained

that implicit in the *Sniadach* cases was the determination that "when the state has created a system whereby state officials will attach property on the *ex parte* application of one party to a private dispute," the applicant may fairly be said to be a state action. 102 S.Ct. at 2757. Such a finding of state action necessarily preceded the application of the due process clause of the Fourteenth Amendment in *Sniadach, Fuentes, Mitchell,* and *North Georgia Finishing.* That "state agents aided the creditor in securing the disputed property" sufficed to establish state action. 102 S.Ct. at 2752.

Two tests for the constitutionality of state attachment or garnishment laws may be gleaned from the *Sniadach* line of cases, as noted by the authors of the article cited above:

> *Fuentes* apparently stands for the proposition that a no-notice attachment is invalid except in "extraordinary situations." The *Mitchell* and *Di-chem* decisions hold that a no-notice attachment is invalid without "other safeguards." If one assumes that *Mitchell* did not impliedly overrule *Fuentes,* the rule of law that can be distilled from the *Sniadach-Fuentes* line is that a seizure of property is unconstitutional if it neither falls into the "extraordinary situations" exception of *Fuentes* nor provides "other safeguards" substantially similar to those in *Mitchell.*

*Maritime Seizures, supra,* at 209.

### Analysis of the Case Law

At this point, constitutional challenges to Admiralty Rules B and C, on both substantive and procedural due process grounds, have been numerous enough to permit some elementary observations. Though the results of such challenges have not been uniform, in the main, courts have upheld the constitutionality of the Rules. *See, e.g., Polar Shipping, Ltd. v. Oriental Shipping Corp.,* 680 F.2d 627 (9th Cir.1982), 1982 A.M.C. 2330 (Rule B(1); procedural due process); *Merchants National Bank v. Dredge General G.L. Gillespie,* 663 F.2d 1338 (5th Cir.1981) (Rule C; procedural due

process); *Kodiak Fishing Co. v. M/V Pacific Pride,* 535 F.Supp. 916 (W.D.Wash.1982), 1982 A.M.C. 2089 (Rule C; procedural due process); *Inter-American Shipping Enterprise, Ltd. v. The Tula,* 1982 A.M.C. 951 (E.D.Va.1981) (Rules B(1) and C; procedural due process); *Anti Costi Shipping Corp. v. Golar Martins,* 1980 A.M.C. 2508 (S.D.N.Y.1979) (Rule B(1); procedural due process); *United States v. Kaiyo Maru,* 503 F.Supp. 1075 (D.Alaska 1980) (Rule C; procedural due process); *Hjalmar Bjorges Rederi v. Tugboat Condor,* 1979 A.M.C. 1696 (S.C.Cal.1979) (Rule C; substantive due process); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne,* 459 F.Supp. 1242 (S.D.N.Y.1978), aff'd 605 F.2d 648 (2nd Cir.1979) (Rule C; substantive due process); *Grand Bahama Petroleum Co., Ltd. v. Canadian Transportation Agencies, Ltd.,* 450 F.Supp. 447 (W.D.Wash.1977) (Rule B(1); substantive due process); *Central Soya Co. v. Cox Towing Corp.,* 417 F.Supp. 658 (N.D.Miss.1976) (Rule C; procedural due process). *But see Cooper Shipping Co. v. Century 21 Exposition,* unpublished opinion, case no. 82–535–Civ–T–GC (M.D.Fla.1982) (Rule B(1); procedural due process); *Alyeska Pipeline v. The Vessel Bay Ridge,* 509 F.Supp. 1115 (D.Alas.1981), 1981 A.M.C. 1086 (Rule C; procedural due process); *Cooke Industries v. Tokyo Marine Co., Ltd.,* 1978 A.M.C. 1979 (D.Alas.1978) (Rule B(1); procedural due process); *Grand Bahama Petroleum Co., Ltd. v. Canadian Transportation Agencies, Ltd.,* 450 F.Supp. 447 (W.D.Wash.1978) (Rule B(1); procedural due process); *Karl Senner, Inc. v. M/V Acadian Valor,* 485 F.Supp. 287 (E.D.La.1980) (Rule C; procedural due process); *Engineering Equipment Co. v. S/S Selene,* 446 F.Supp. 706, 1978 A.M.C. 809 (S.D.N.Y.1978) (Rule B(1); substantive due process) (minimum contacts with U.S. as a whole sufficient).

Though the courts have used different rationales in upholding the procedural and jurisdictional schemes of the Rules, some themes have predominated. With few exceptions, the courts have implicitly acknowledged the deficiencies of the Rules but have looked to the Federal Rules of Civil Proce-

dure, local district court rules, and/or the inherent equitable power of the district court sitting in admiralty to "bolster" the procedures set forth in the rules. *See, e.g., Amstar Corp., supra,* at 912; *Merchants National Bank, supra,* at 1344; *Anti Costi Shipping, supra,* at 2510–11. No court, either in upholding the Rules or in finding them unconstitutional, has rigidly applied the due process reasoning of the *Sniadach* line of cases. The courts have heeded well the Supreme Court's characterization of due process: "The requirements of due process of law 'are not technical, nor is any particular form of procedure necessary.' . . . 'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' . . . ." *Mitchell,* 416 U.S. at 610, 94 S.Ct. at 1901 (citations omitted). The mobile nature of commerce in admiralty and the ease with which vessels could escape the court's jurisdiction, along with the historical and constitutional distinctions between admiralty and the common law, have influenced many decisions with regard to Rules B and C.

Indeed, none of the courts have found that pre-arrest or pre-attachment notice and opportunity to contest the seizure are mandated by the Fifth Amendment due process clause. Not only would pre-seizure notice and hearing be impractical (maritime attachment is not available unless the defendant cannot be found within the district), but it would defeat the very ends contemplated by the Rules, that is, the acquisition of jurisdiction and foreclosure of a maritime lien. As the court in *Polar Shipping* said,

> The ship, if it were being libelled under Supplemental Rule C, could depart beyond the jurisdiction; the other property, to be seized under Supplemental Rule C, or attached under Supplemental Rule B, could be shipped out, otherwise disposed of, or concealed; credits such as are here involved, could be collected or transferred out of the jurisdiction.

680 F.2d at 638. This reasoning is consistent with *Mitchell* and *North Georgia Finishing.* The threat of destruction, sale, or concealment of the property sought to be attached is one of the creditor's interests, which, in this case, outweighs the debtor's interest in prior notice and opportunity to contest the seizure. *See Amstar Corp., supra,* at 911; *Merchants National Bank, supra,* at 1344. As for notice of the arrest or attachment itself either immediately prior thereto or upon receipt of the summons or warrant, it is difficult to disagree with the Advisory Committee's comment that the garnishee or custodian of the attached property will have an interest in giving immediate notice to the defendant of the attachment or garnishment. Nor does the Court have any doubt that, by local custom in many ports, the defendant's local agent or attorney is notified prior to seizure. This is exactly what occurred in the case at bar.

Attention has been focused primarily on the other alleged deficiencies: the absence of judicial supervision, the conclusory nature of the allegations in the complaint and the lack of a provision for a prompt post-seizure hearing. These deficiencies have not convinced the courts of appeals, who have addressed the constitutionality of Rules B and C, to hold the Rules unconstitutional. *See Polar Shipping, Ltd., supra; Amstar Corp., supra.* The Fifth Circuit in *Merchants National Bank* (which is not binding on the Eleventh Circuit, *see Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982)), questioned the value of a judge or magistrate's participation when complicated transactions are often involved. The danger of defeating the seizure which might "effectively dispose of the claim on the merits without trial," 663 F.2d at 1344, outweighed any value such supervision might have to the debtor. As for the lack of a prompt post-seizure hearing, the court adverted to the district court local rule which provides:

> Whenever there is an arrest *in rem* or whenever property is attached, the party arrested or any person having a right to intervene in respect of the thing attached, may, upon evidence showing any improper practice or a manifest want of equity on the part of the libellant, be entitled to an order requiring the libel-

lant to show cause *instanter* why the arrest or attachment should not be vacated.

This rule, which guarantees a prompt post-attachment or arrest hearing upon application and presentation of evidence of wrongdoing or mistake, cures the omission from Rule C of such a provision, according to the Fifth Circuit. Even where no such rule has been adopted, the same result obtains under the admiralty court's inherent powers. 663 F.2d at 1344. The Fourth Circuit found that Rule 12 of the Federal Rules of Civil Procedure would serve the same purpose as the local rule and therefore upheld Rule C despite the lack of a provision for a prompt post-arrest hearing.[2] 664 F.2d at 912. The Fourth and Fifth Circuits are in accord in holding that "[b]ecause of the historical uniformity and the unique character of the admiralty *in rem* procedures," 663 F.2d at 1350, the *Sniadach* line of cases with their two-fold test of constitutionality do not apply to Rule C procedures. *See* 664 F.2d at 910.

As I have already discussed, however, and as the Fifth Circuit made abundantly clear in its decision, the considerations which arise in the context of Rule C are by no means necessarily the same considerations that Rule B would raise. "A maritime lien represents a property interest entirely distinct from an *in personam* right." 663 F.2d at 1350.

In *Polar Shipping Ltd.,* the Ninth Circuit found the Rule B(1) post-attachment hearing procedure, supplemented by a local rule

identical to the one quoted above, adequate. The court rejected the contention that the Rule was unconstitutional in failing to provide for judicial participation in the issuance of the writ and found inaccurate the description of the verified complaint and affidavit as conclusory. The exact basis of its decision in this regard is difficult to discern. The court addressed the contentions, found them without substance because the complaint and affidavit contained specific allegations and because judicial participation "would add little protection, if any, to the defendants," 680 F.2d at 639, then rendered its discussion meaningless by finding that Rule B(1) fell within the "extraordinary situations" category, concluding with the comment that admiralty procedures have "a history and sanction of their own." *Id.* at 640.

The district court in *Anti Costi Shipping,* 1980 A.M.C. 2508 (S.D.N.Y.1979), also engaged in a balancing of interests exercise in addition to utilizing the "extraordinary situations" standard, a local rule and Rule E in order to find Rule B(1) constitutional. The district court in *Cooper Shipping Co. v. Century 21 Exposition,* unpublished opinion, Case No. 82–535–Civ–T–GC (M.D.Fla.1982), apparently balanced the interests and concluded that neither its own inherent powers in admiralty or Rule E could change the fact that "under Rule B, a party may attach property after merely filing a complaint with the clerk of court [with] no requirement for a judicial determination of the validity of the complaint [or] provisions for

---

**2.** The court in *Amstar Corp.* also relied on the security and release by stipulation provisions in Rule E. *See* 664 F.2d at 912. Pertinent portions of Rule E are as follows:

(5) *Release of Property.*

(a) *Special Bond.* Except in cases of seizures for forfeiture under any law of the United States, whenever process of maritime attachment and garnishment or process in rem is issued the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by stipulation of the parties, conditioned to answer the judgment of the court or of any appellate court.

(b) *General Bond.* The owner of any vessel may file a general bond or stipulation, with

sufficient surety, to be approved by the court, conditioned to answer the judgment of such court in all or any actions that may be brought thereafter in such court in which the vessel is attached or arrested.

(8) *Restricted Appearance.* An appearance to defend against an admiralty and maritime claim with respect to which there has issued process in rem, or process of attachment and garnishment whether pursuant to these Supplemental Rules or to Rule 4(e), may be expressly restricted to the defense of such claim, and in that event shall not constitute an appearance for the purposes of any other claim with respect to which such process is not available or has not been served.

either a pre-seizure or speedy post-seizure hearing." *Id.* at 3.

Judge Beeks' decision in *Grand Bahama* remains the most well-reasoned and thorough opinion on the constitutional validity of Rule B(1). Noting the similarity of the case before him and *North Georgia Finishing,* Judge Beeks proceeded to apply the "extraordinary situations" test to maritime attachment and garnishment. He found that the first prong of the test as implemented in *Calero-Toledo* was not met because the mere assertion of admiralty jurisdiction did not, in his opinion, serve a significant governmental purpose. In order to reach this conclusion, he had to distinguish the Supreme Court's citation of *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), as an example of a seizure which served a governmental and public interest—attachment of property necessary to secure jurisdiction. Other courts have relied on *Ownbey* and the court's comments about it to uphold Rule B and C. *See Amstar Corp., supra,* at 908; *Polar Shipping, supra,* at 640; *Anti Costi Shipping, supra,* at 2512; *Central Soya Co., Inc. v. Cox Towing Corp.,* 417 F.Supp. 658, 664 (N.D.Miss.1976). The *Grand Bahama* court first found that the holding of *Ownbey* did not actually involve the precise point for which it was cited and then questioned the "continued vitality" of *Ownbey* in light of *Shaffer v. Heitner,* in which the court noted: "We do not read the recent references to *Ownbey* as necessarily suggesting that *Ownbey* is consistent with more recent decisions interpreting the Due Process Clause." 433 U.S. at 194 n. 10, 97 S.Ct. at 2574 n. 10. The *Grand Bahama* court further found that maritime attachment initiated by a private party was not a " 'truly unusual' " situation. 450 F.Supp. at 457 (quoting *Fuentes,* 407 U.S. at 90, 92 S.Ct. at 1999).[3]

The court then distinguished the case before it from *Mitchell* and found that the safeguards which saved the sequestration statute there, were not provided by Rule B(1): judicial participation, specific, factual allegations showing a right to possession, posting of bond by the creditor, and the opportunity to seek immediate dissolution of writ which would be done unless the creditor proved his entitlement to the writ. The balancing of interests analysis employed in *Mitchell,* the court concluded, did not favor the creditor: "The vitality of maritime commerce depends as much on the availability of protections against the mistaken summary deprivation of the property of maritime defendants as it does on the availability of speedy remedies for maritime plaintiffs." 450 F.Supp. at 458. As I noted above, the historic role of maritime attachment in admiralty jurisprudence did not persuade the court to uphold its procedures. Nor did the fact that admiralty is an autonomous branch of federal law convince the court that the procedures were constitutionally adequate: "I can find no indication that maritime defendants may be constitutionally due less procedural protection against the mistaken deprivation of property than non-maritime defendants." 450 F.Supp. at 459 (footnote omitted).

### *Constitutionality of Admiralty Rule B(1)*

■ Though I find persuasive parts of each of the opinions discussed, I cannot adopt any one opinion's reasoning in its entirety. I am convinced that Rule B(1) does not comport with the Fifth Amendment due process law in that it does not contain adequate safeguards to protect against the mistaken deprivation of property. It is important to note that not only could the defendant's property be mistakenly seized when the defendant is actually within the district for purposes of personal service, but also a third party's property may be mistakenly seized and effectively withdrawn from commerce. Plaintiffs must establish ownership, but because of

---

**3.** Examples of the limited situations which satisfy the first prong of the "extraordinary situations" test are protection of the public from contaminated food, from bank failures, and from misbranded drugs; the collection of taxes and seizures to aid war efforts, and forfeitures under criminal statutes also justify the postponement of notice and hearing. *Calero-Toledo,* 416 U.S. at 678–9, 94 S.Ct. at 2089.

the existence of a pattern of complex corporate structures within the shipping industry, the facts are not always readily ascertainable. Because plaintiffs may be misled by registries of ship ownership,[4] it is simply not possible to guard against every mistaken seizure. The chance of depriving the defendant of property when it or its officers or agents are available in the district for personal service or when the claim is clearly meritless may however be substantially decreased by fashioning procedures which will be a constitutionally and commercially adequate accommodation of all interests involved. Such an accommodation may easily be reached by the addition of several procedural requirements, none of which would overly tax commercial practice and all of which would go far to ensure that the defendant's goods or credits would be seized only when probable cause to do so exists.

The court in *Fuentes* carved an exception to the notice and hearing requirement for "extraordinary situations" which are "truly unusual" and which "justify *postponing* notice and opportunity for a hearing." 407 U.S. at 90, 92 S.Ct. at 1999 (emphasis added). There has been universal agreement that both notice and an opportunity for a hearing should be *postponed* until after the attachment or garnishment. Whether one construes maritime attachment and garnishment as an "extraordinary situation" or whether the postponement is a facet of the flexible application of due process, through a balancing of interests, to a commercial practice, seems immaterial.

■ But it is certainly possible and perhaps helpful to consider the argument that Rule B(1) represents an "extraordinary situation." To distinguish *Ownbey* as of doubtful vitality in light of *Shaffer,* as the court in *Grand Bahama* did, begs the question when it is settled that *Shaffer* is not applicable to admiralty jurisdiction. Therefore, attachment to acquire jurisdiction in admiralty may still serve an important governmental or general public interest thus satisfying the first step of the "extraordina-

ry situations" test. The need for prompt action, the second prong of the test, is evidenced by the very real threat that the property to be attached may simply sail out of the court's jurisdiction never to return. The third facet of the test, strict control by the state over its monopoly of legitimate force, simply is not satisfied in the case of Rule B(1). In order to meet the test of strict control, "the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." 407 U.S. at 91, 92 S.Ct. at 2000. Although the government is a joint participant in the seizure, *see Lugar v. Edmondson Oil Co., supra,* a private party initiates the attachment. Moreover, the clerk of court who issues the writ performs a purely ministerial act in doing so upon the presentation of a complaint and affidavit containing conclusory allegations. Thus, I agree with the *Grand Bahama* court's conclusion, though not with its reasoning, that Rule B(1) attachment is not an "extraordinary situation" within the meaning of *Fuentes* and *Calero-Toledo.* I am, however, in full agreement with the conclusion of the majority of courts that pre-attachment notice and opportunity for a hearing is not warranted. Due process will not be construed so as to defeat entirely the remedies available to those to whom the defendant may be liable.

■ I cannot agree with the court in *Polar Shipping, Ltd.* that due process does not require the plaintiff or his attorney to present specific, factual allegations in the affidavit stating that the defendant cannot be found within the district. Though the Court has no doubt that plaintiff's counsel undertook a diligent search for officers of the defendant within the district, the Rule allows affidavits based upon mere information and belief. *Cf. Polar Shipping, Ltd., supra,* at 639–40. Where the whole thrust of the Rule is to provide a means of acquiring jurisdiction when the defendant cannot

---

4. This is what actually occurred in this case.

be found within the district, the plaintiff must allege more than that upon information and belief the defendant cannot be found. By requiring the plaintiff to describe the various ways by which the defendant was sought, thereby ensuring that the plaintiff will exercise some diligence in searching for the defendant, its officers or agents for service, the chances of a mistaken deprivation of property will be lessened.

The complaint here did not lack specificity sufficient upon which to base the issuance of the writ of attachment. Unfortunately, however, the defendant did not own the property initially attached. The Rule could perhaps alleviate the chance for such mistaken seizures but as I have noted, even attaching what purports to be proof of ownership to the complaint will not guarantee that *the defendant's* property will be attached or garnisheed. Rule E requires that the complaint state the allegations with sufficient particularity to enable the defendant to frame an answer and commence an investigation of the facts. This is equivalent to the "notice pleading" requirement of Rule 8(a) of the Federal Rules of Civil Procedure. In the Court's opinion, to require more of the plaintiff in the way of proof of ownership or substantiation of its claim would be unduly burdensome, would hinder commercial practice, and would potentially defeat jurisdiction. The balance of interests does not weigh in the defendant's favor with regard to the complaint.

Moreover, the participation of a judicial officer in the issuance of the writ by reviewing the complaint and affidavit would render less threatening the conclusory nature of the allegations in the complaint. I cannot agree with the Ninth Circuit that judicial supervision would be of no benefit to the defendant. *Polar Shipping, supra,* at 639. To the contrary, I find that the interjection of a judicial officer would provide significant safeguards. The Supreme Court in *Mitchell* distinguished a constitutional statute from an unconstitutional statute on the basis, *inter alia,* of judicial supervision. This decision forecloses the argument that the element of judicial participation in the issuance of the writ does not rise to the level of constitutional significance. Weighing the balance of interests, I find that no interest of the plaintiff is implicated and that requiring the plaintiff to present its complaint and affidavit to a judicial officer, either judge or magistrate, will offer protection from wrongful attachment which is lacking in Rule B(1).

■ I am persuaded by the Ninth Circuit's argument that Rule E provides sufficient opportunity for the release of attached or garnisheed property upon the posting of a bond. Rule B(1), as supplemented by Rule E, is not inadequate in this respect. *See Polar Shipping, supra* at 640–42.

■ Rule B(1) does not provide for a post-garnishment or post-attachment hearing. However, as the court in *Polar Shipping* pointed out, "[p]roviding an immediate post-attachment hearing for a determination of whether an attachment is based on a frivolous or clearly meritless claim, or has been effected despite the presence of the defendant in the district is consistent with the language and purposes of Supplemental Rule B." 680 F.2d at 627. Thus, the Rule may be upheld despite the deficiency if a local rule provides for a prompt post-attachment hearing. *Id.* The Fifth Circuit, in *Merchants National Bank, supra,* in upholding the constitutionality of Rule C, expressed the opinion that even without a local rule, the district court, exercising its inherent powers in equity, could fashion relief in the form of a prompt post-attachment hearing.

The plaintiff here urges that the defendant was afforded such a hearing. However, it appears that the parties did not address themselves to the issue of the frivolity or merit of the plaintiff's claim but only to the constitutionality of Rule B(1). The plaintiff also directed the Court's attention to two local rules which, according to the plaintiff, guarantee the opportunity for a post-attachment hearing. Local Rule 5 governs the procedure for petitioning judges in chambers, requiring that notice shall be given to opposing counsel whenever

an *ex parte* motion or application is to be made to the court or when an attorney desires to confer with a judge regarding a pending case. Local Rule 11 supplements Rule E by setting forth procedures for the release of seizures, the payment of custodial costs, and the posting of bonds. Neither rule provides expressly for a post-attachment hearing.

The Court is somewhat troubled by the efforts to bolster the Rule by the use of local rules since the outcome renders the Rule "facially" constitutional in some districts and "facially" unconstitutional in other districts. I am even more bothered by the idea that the Court's inherent powers in admiralty make up for the Rule's constitutional deficiencies. The existence of such powers in no way informs the parties and interested third parties of a right to a post-attachment hearing. I cannot find that these inherent powers supply the necessary safeguards. And because this district does not have a Local Rule equivalent to those which afford interested parties a prompt post-attachment hearing, the Court cannot find Rule B(1) in its present form constitutionally adequate to protect the defendant from the danger of deprivations of property.[5]

The Court with its sister courts in the Brunswick and Augusta Divisions will act upon this recognition of the Rule's inadequacies by formulating a local rule to cure the defects.

### Conclusion

For the foregoing reasons, I find Rule B(1) unconstitutional. The defendant's motion to quash the process of maritime attachment and garnishment is therefore granted and the complaint is dismissed.

---

5. A federal district court may hold a rule formulated by the U.S. Supreme Court unconstitutional. *See Polar Shipping, Ltd.,* 680 F.2d at 634–5; *Amstar Corp.,* 664 F.2d at 906; *Alyeska*

*Pipeline Service Co. v. The Vessel Bay Ridge,* 509 F.Supp. 1115, 1123 n. 44; *Grand Bahama,* 450 F.Supp. at 449–51.